**UNITED STATES of America**

v.

**DICKER, Leon, Appellant.**

No. 87–5822.

United States Court of Appeals, Third Circuit.

Argued June 8, 1988.

Decided Aug. 4, 1988.

Rehearing Denied Oct. 5, 1988.

Richard M. Asche (argued), Litman, Asche, Lupkin & Gioiella, New York City, for appellant.

Samuel A. Alito, Jr., U.S. Atty., Claudia Flynn (argued), Edna Ball Axelrod, Chief, Appeals Div., Newark, N.J., for appellee.

Before BECKER, STAPLETON and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter is before the court on appeal from a judgment of conviction entered on a jury verdict against appellant Leon Dicker for conspiring with Richard Koziuk and Henry Teja and others to export from the United States defense articles designated on the United States Munitions List, by means of untrue statements of material fact in connection with a license application contrary to 22 U.S.C. § 2778(b)(2) and (c) and 22 C.F.R. §§ 121.1, 127.1(a), 127.2, and 127.3. Koziuk and Teja were tried with Dicker and were acquitted.[1] We conclude that evidence was improperly admitted against Dicker which substantially prejudiced him. Thus, we will reverse the judgment and remand the matter for a new trial.

The case can best be understood if the applicable statute and regulations are first explained. The statute, 22 U.S.C. § 2778(b)(2) and (c), provides, with exceptions not germane, that no defense articles on the United States Munitions List may be exported without a license issued in accordance with administrative regulations and that any person who does so or who makes a willfully untrue statement in a license application is guilty of a crime. Articles on the United States Munitions List are enumerated in 22 C.F.R. § 121.1. The weap-

ons involved in this case are on the list. 22 C.F.R. §§ 127.1(a), 127.2 and 127.3 further implement 22 U.S.C. § 2778(b)(2) and (c).

A person wishing to export significant military equipment, such as that involved in this case, must apply for a license from the Office of Munitions Control. His application is to be accompanied by a "nontransfer and use certificate," executed by the foreign consignee and foreign end user, which stipulates that, except as specifically authorized by prior written approval of the Department of State, the foreign consignee and foreign end user will not reexport, resell or otherwise dispose of the equipment outside of the country named as the location of the foreign end use. 22 C.F.R. § 123.10(a). This nontransfer certificate is informally referred to as an end user certificate. 22 C.F.R. § 127.2 specifically lists nontransfer and use certificates, i.e., end user certificates, as documents which must not contain misrepresentations.

In December 1986 or January 1987 Dicker asked an acquaintance, Abelardo Morua, who was also indicted for conspiracy but pleaded guilty and cooperated with the government, to find an arms dealer so that Dicker and persons he represented could obtain weapons for export. Thereafter, Morua contacted George Edelstein to whom he gave a list obtained from Dicker of weapons Dicker wanted to acquire. Edelstein advised Morua that export documents including an end user certificate showing the final destination for the weapons would be required for the transaction. Edelstein then reported the matter to the United States Customs Service and thereafter cooperated with the government throughout the affair. Subsequently, in recorded telephone conversations Morua asked Edelstein what it would cost for Edelstein to supply the export documents and was advised it would be $50,000. Morua testified that it was never his thought that the paperwork would be legal.

---

1. Dicker, Koziuk and Teja were also indicted for conspiring to export the articles without an export license or other written approval but all three were acquitted on that charge. The judg-

ment at page 1385 in the appendix on appeal incorrectly recites that Dicker was convicted of conspiracy to export the defense articles without a license.

On March 2, 1987, Morua and Edelstein set up a meeting at the Glen Pointe Hotel in Teaneck, New Jersey, to discuss the terms of the transaction. Morua agreed to bring his "money man," Dicker, and Edelstein agreed to bring his licensing man, special agent Douglass Farrell of the United States Customs Service, who was working undercover, to the meeting. The conversations at the meeting were recorded and later transcribed. By coincidence Dicker and Edelstein were acquaintances as they had been involved in a prior, apparently legitimate transaction. Thus, Dicker seems to have been pleasantly surprised when he saw Edelstein, an attitude clearly reflected in the rather relaxed atmosphere at the meeting. Indeed, Dicker and Edelstein reminisced that the prior deal fell through because an Italian financier involved who "had more money than Heinz has pickles" got "hungry." .

It was agreed at the meeting that Dicker and Morua would pay Edelstein $145,000 for the weapons and an additional $50,000 to Farrell for the licensing, a price Farrell justified by pointing to the time constraints for the transaction. While it may be reasonably inferred that Farrell represented that bribes would be necessary for the licensing, and Edelstein openly said so, there is no indication in the transcript that the documents to be obtained were not to be genuine.[2]

At the meeting there was the following discussion of the destination of the weapons:

G. EDELSTEIN: Now, you need some information.

S/A FARRELL: I need ...

A. MORUA: (Inaudible) information.

S/A FARRELL: I am, I am gonna need information, as you're well aware, for the EUC's [end user certificates], for the paperwork.

L. DICKER: But I can tell you ...

S/A FARRELL: I un- ...

L. DICKER: It's no problem.

S/A FARRELL: You can tell me.

A. MORUA: Yeah, right.

S/A FARRELL: Terrific. That'll facilitate it. Okay. I'm gonna need the exporter.

L. DICKER: It's going ...

G. EDELSTEIN: No, Who's the exporter?

S/A FARRELL: Who's the exporter?

L. DICKER: Who's the exporter? It's the Dominican Police Department.

S/A FARRELL: Okay.

L. DICKER: The importer's the Bangkok Police Department in Thailand.

S/A FARRELL: All right. So the Dominican Police Department will be the consignee also, right?

L. DICKER: That's right.

S/A FARRELL: Okay.

L. DICKER: That's right, because they have to ship it out to them.

S/A FARRELL: All right. So then you would need a, an EUC for the DR, is that correct?

L. DICKER: That's right. Absolutely. [Pause.]

S/A FARRELL: All right, let me ask you a question. You want a EUC for the Dominican Republic.

L. DICKER: That's right.

The transcribed conversation does not include any statement that Dicker wanted to conceal the destination of the weapons from the government or any discussion of the technical requirements for an end user certificate or the licensing. There was no discussion of whether the end user certificate should omit any reference to Thailand as the ultimate destination for the goods, though it was said the certificate would be for the Dominican Republic. Further, it appears from the transcript that while Dicker had some knowledge of the documents required for the export of the arms, he was hiring Farrell to handle the matter and it was Farrell who was the expert and knew how to get the necessary documents. In particular, Dicker never indicated that the licensing was to be obtained with fraudulent documents. To the

---

**2.** Edelstein explained that: "Doug has to go down and start spreading it around," information which obviously did not shock Dicker as he responded: "I understand. I understand."

contrary, at one point Farrell said: "You know what we're dealing with as far as paperwork and things that have to be in proper order." Later on Morua said that it was "very important that everything is made properly."

At the trial, however, the Teaneck meeting was remarkably transformed during Farrell's testimony. Thus, Farrell testified as follows:

> Mr. Edelstein introduced me as being what he called the licensing man. I was introduced as the individual that would be able to secure a phony end user certificate and a State Department license using this phony end user certificate in order to export these arms.

But what Edelstein really said at the hotel was:

> Now, my licensing man is Doug. Anything requiring licensing or anything else, Doug handles.

Farrell testified that:

> We discussed—I discussed the price, the fee that would be involved for me to acquire the phony paperwork. I advised Mr. Morua and defendant Dicker that it would cost $50,000 for me to be able to get the phony paperwork, to get the licensing for the arms.... I discussed the problems with acquiring the phony paperwork and the reason for the high fee of $50,000, for getting the phony paperwork....

In reality, however, Farrell did not discuss "phony" paperwork with Dicker and Morua. Thus, the transcript of the Teaneck meeting shows that Farrell said the following:

> ... You have time constraints.

> I said obviously you have time constraints. Okay? And that's the reason for, you know, the large fees. Because ...

> I'm buying time, time here.

> Well, you have to realize, the problem there is you're talking about some-

thing that normally takes six to eight weeks.

> That we are going to do in forty-eight hours. Okay? That necessitates my going there, being there, sitting on people's doorsteps, okay? And even at that, forty-eight hours, that's a tough bill to fill. Honestly. All right?

> And that's also the reason for the fees that are involved. You know, what you're looking for is, uh, is a small miracle. And not to say it can't be done. We can do it. But as it goes with anything else, it's going to cost.

At the trial Farrell testified that he told: Morua and defendant Dicker that I would need 50 percent of my fee, which was $25,000, I would need that in cash up front before I could go to Washington and get the phony paperwork.

However, what he actually said at the hotel was:

> My needs, okay, would be half of the fee up front. I need that to go down to work with, okay? That's for me to go down in good faith. I can't go down empty-handed. I need something to work with when I'm down there. I can guarantee you paperwork in seven, in forty-eight hours, but I need ...

Thus, Farrell did not indicate that the paperwork was to be phony.

In particularly damaging testimony Farrell said that: "I told defendant Dicker that in order to get the phony paperwork I would need some information." In fact, Farrell did say that he would need information for the paperwork but never indicated that it was to be phony.

The mischaracterization of the evidence was compounded by the questions to Farrell, permitted over Dicker's objection, asking Farrell to explain what he meant when he used various phrases at the Teaneck meeting. Thus, at the trial the following testimony was given, the page references being to the transcript of the Teaneck meeting:

Q  On page 16, Special Agent Farrell, in about the middle of the page you say, 'I said obviously you have time constraints. Okay? And that's the reason for, you know, the large fees.'

Do you see those lines?

A  Yes, I do.

Q  At the time you were meeting at the Glen Pointe Hotel, what did you mean when you said those words?

.    .    .    .    .

A  When I spoke those words, I was talking about the fact that defendant Dicker and Mr. Morua wanted me to a [sic] supply phony paperwork and a license for them within 48 hours, a process which normally takes six to eight weeks.

.    .    .    .    .

Q  Can you turn to page 23, please.

At the bottom of the page, you say, 'Okay, so you know what we're dealing with' and a couple of lines down, 'as far as EUC's and things go.'

Did you see that?

A  Yes, I do.

Q  When you were at the Glen Pointe, what did you mean when you said those words?

A  What I was talking about was I was asking defendant Dicker and Mr. Morua if they understood what the procedure was as far as getting the phony paperwork and acquiring the license with the phony EUC.

.    .    .    .    .

Q  Can you turn to page 30, please.

About three quarters of the way down the page you say, 'From the time money is in my hands, 48 hours I'll have the paperwork in your hands. That's the way it is.'

Do you see that?

A  Yes, I do.

Q  What did you mean when you said those words?

A  What I meant was that from the time they paid me my $25,000 in cash, which was one-half of my fee, within 48 hours I would have acquired a phony

EUC and a State Department license with that phony EUC.

.    .    .    .    .

Q  On page 37, in the middle of the page, you say, 'I'm not only protecting myself, I'm protecting my sources.'

Do you see that?

A  Yes, I do.

Q  When you were talking about sources in that conversation at the Glen Pointe, what were you talking about?

A  I was talking about my sources for acquiring the phony paperwork.

.    .    .    .    .

About three quarters of the way down the page, you say, 'Because I may be able to lay the groundwork with this' and then two lines down, 'For the future deals.'

Do you see that?

A  Yes, I do.

Q  What were you talking about there at the Glen Pointe when you said those words?

A  I was talking about laying the ground work with my sources for the phony paperwork for the future, larger dealings for the tanks and APCs.

The following day Dicker, Morua, Edelstein and Farrell met in a van parked on a street in New York City. Their conversation was again recorded. Farrell asked Dicker, "All right, so you discussed the licensing and the paperwork with your people. Everything's fine, okay?" Dicker responded, "Yes, everything's fine the way we discussed yesterday, Doug." Over Dicker's objection Farrell was permitted to express his "understanding" as to what Dicker was saying in the conversation which was that Farrell "understood him to mean that he had discussed the $50,000 fee with his buyers and he had discussed with them what I would have to go through to get the phony paperwork and that it was all right with them." Subsequently, Farrell explained that his understanding as to the meaning of the conversations was based on his "prior law enforcement experience, 16 years both as a patrol officer and

a special agent, some prior undercover experience that I've had, my experience working munitions cases, and my participation in this case as an undercover agent." At the March 3, 1987 meeting Dicker and Morua paid $55,000 in cash on account of the transaction and saw samples of the weapons.

There was another meeting on the matter on March 5, 1987 between Morua and Farrell and another undercover agent. While Dicker was not present at the meeting, he left $75,000 with Morua which Morua turned over for the purchase of the weapons and for the license. At that time Farrell and the other agent indicated the license had been obtained and either had been or would be filed in the appropriate office in New York. The following day Dicker was arrested in New Jersey when he went there with Koziuk and Teja to inspect the weapons before they were shipped.

On this appeal Dicker contends that the court erred in permitting Farrell to testify as to what he meant by his words and what he understood Dicker to be saying. The district judge in an oral opinion explained that "the conversations were truncated sentences, sentence fragments and incomplete thoughts. Throughout these conversations code words were used." He indicated that based on Farrell's experience, Farrell could explain these words. He held that Farrell's testimony was admissible under Fed.R.Evid. 701 as a lay witness opinion rationally based on Farrell's perception which would assist the jury in understanding the case. The judge also said that Farrell had not testified as to Dicker's state of mind.

In our view Farrell's testimony in which he continuously referred to the "phony" paperwork and in which he set forth his understanding of the meaning of the conversations on March 2 and 3 was improper.[3] There is, of course, no doubt that Dicker wanted to acquire weapons and export them, an end not necessarily unlawful. He was introduced to Farrell who could assist him in this purpose and who was represented to have expertise in licensing. At the Teaneck meeting the licensing was generally discussed with the emphasis being placed on the need for speed and the resulting cost. Farrell asked Dicker where the weapons were going and was told the Dominican Republic and then Thailand.[4] The government does not explain in its brief why this could not legitimately be done. Further, at the Teaneck meeting while Dicker indicated that he had some knowledge of the rather intricate licensing procedures involved, he never said he expected to get "phony" documents or that phony documents should be used to circumvent the licensing procedures.

Farrell described the meeting at Teaneck not as it took place but as he interpreted it. The same was true as to his description of what Dicker said the next day in the van. He was thus testifying as to his opinion of what was meant or as to the inferences which he drew from the conversation.

The government seeks to sustain the trial court's admission of this evidence on the basis of Fed.R.Evid. 701 which provides that if a witness is not testifying as an expert, his testimony in the form of an opinion or inference is limited to opinions and inferences rationally based on the perception of the witness and helpful to a clear understanding of his testimony or the determination of a fact in issue. While it is debatable whether Agent Farrell's testimony was rationally based on his perceptions, it clearly did not fulfill the helpfulness requirement of Rule 701.

Although courts have construed the helpfulness requirement of Fed.R.Evid. 701 and 702 to allow the interpretation by a witness of coded or "code-like" conversations, they have held that the interpretation of clear conversations is not helpful to the jury, and thus is not admissible under either rule.

---

3. We will review this matter involving the receipt of evidence on the assumption, favorable to the government, that we can reverse only for an abuse of discretion. *See Robinson v. Lehman,* 771 F.2d 772, 782 (3d Cir.1985).

4. The record does not make it certain that Thailand was the ultimate destination for the weapons. It may have been a North African country.

*See United States v. De Peri,* 778 F.2d 963, 977–78 (3d Cir.1985), *cert. denied,* 475 U.S. 1110, 476 U.S. 1159, 106 S.Ct. 1518, 2277, 89 L.Ed.2d 916, 90 L.Ed.2d 720 (1986); *United States v. Cox,* 633 F.2d 871, 875–76 (9th Cir.1980), *cert. denied,* 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981); *United States v. White,* 569 F.2d 263, 267 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978); *United States v. Alfonso,* 552 F.2d 605, 618 (5th Cir.), *cert. denied,* 434 U.S. 857, 922, 98 S.Ct. 179, 398, 54 L.Ed.2d 129, 279 (1977); *United States v. Marzano,* 537 F.2d 257, 268 (7th Cir.), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1976); *DeLoach v. United States,* 307 F.2d 653 (D.C.Cir. 1962).

■ In response to Dicker's objections to the admission of Farrell's opinion testimony, the trial judge stated:

It's clear to me that there are certain code words in here. I am not [sic] aware of what they meant until I was told what Mary's meant, what two thousands meant, what APC meant, what T–34's meant, what Ruskies meant in connection with this. There is an awful lot that is said, as has been pointed out by the witness, by inference here. I'm going to permit him to testify from that point of view. He's not speculating, he's using his experience. There are code words, code sentences, code sentence fragments in here. It is not a conversation as you and I are having right now where everything is explicitly set forth.

While the trial judge was certainly correct in his assertion that intepretation of code words by a witness is permissible,[5] the interpretation of *clear* statements is not permissible, and is barred by the helpful-

ness requirement of both Fed.R.Evid. 701 and Fed.R.Evid. 702.

The trial judge dictated into the record a memorandum dated September 28, 1987, in which he set forth in detail his reasons for admitting Farrell's testimony. He relied mainly on our decision in *De Peri,* in which we held admissible under Rule 701 the interpretation by a former police officer, Joseph Alvaro, of recorded conversations between Alvaro and a deputy police commissioner, James Martin. Those conversations related to the destruction of evidence against police officers who had been indicted for extortion to protect illegal gambling operations.[6] In his September 28 memorandum, the trial judge quoted the following language from *De Peri:*

Martin's language on the tapes is sharp and abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that are clear only to Martin and his audience. To the uninitiated listener, Martin speaks as if he were using code. Alvaro's opinions are based on his direct perception of the event, are not speculative, and are helpful to the determination of Martin's involvement in the protection scheme and the subsequent attempt to silence Ricci with 'hush money.' [778 F.2d at 977–78]

However, the *De Peri* court went on to say, in a passage not quoted by the trial court:

Moreover, the trial court vigorously policed the government's examination of Alvaro to ensure that he was not asked to interpret relatively clear statements. Under these circumstances, we find that the court did not abuse its discretion. [*Id.* at 978]

5. Generally, such testimony is admitted as expert testimony, because it is based on the "specialized knowledge" of the witness. Fed.R.Evid. 702. *See, e.g., United States v. Hoffman,* 832 F.2d 1299, 1310 (1st Cir.1987); *United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir.), *cert. denied,* —— U.S. ——, ——, 108 S.Ct. 355, 357, 98 L.Ed.2d 380, 382 (1987), —— U.S. ——, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988); *United States v. Windfelder,* 790 F.2d 576 (7th Cir.1986); *United States v. Barletta,* 565 F.2d 985, 991–92 (8th Cir.1977); *United States v. Alfonso,* 552 F.2d 605, 618 (5th Cir.), *cert. denied,* 434 U.S. 857,

922, 98 S.Ct. 179, 398, 54 L.Ed.2d 129, 279 (1977); *United States v. Borrone-Iglar,* 468 F.2d 419, 421 (2d Cir.1972), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973).

6. It is natural that there would be a difference between the *De Peri* conversations and the ones in this case, as in *De Peri* Martin knew at the time of the conversations that an investigation was in progress, and thus was less likely to speak openly and unambiguously.

This omitted passage is what distinguishes the instant case from *De Peri*. Had the trial court in *De Peri* permitted the interpretation of clear statements, as did the trial court in the instant case, the testimony as to the meaning of the clear statements would not have been admissible, because it would not have been helpful to the jury's understanding.

The Court of Appeals for the Ninth Circuit faced a similar evidentiary question in *United States v. Cox*, 633 F.2d 871 (9th Cir.1980), *cert. denied*, 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981). In that case, the defendant was convicted of possession of unregistered firearms, specifically pipe bombs. Witness Jeanette Carter responded to a question by the government by saying:

> He never actually said that, you know, he had blown it up but it was my understanding, or by his mentioning that he had a friend and that when he showed me the article that it was my impression when we were done talking that he was involved in having it blown up. [*Id.* at 875]

The court, although it found the error harmless, declared that Carter's testimony should not have been admitted, because the witness's " 'understanding' did not aid the triers of fact in their understanding of what the appellant had said and done. The jury could draw its own conclusions from what Carter had already testified. Her additional analysis was irrelevant and should not have been admitted." *Id.* at 876.

In *United States v. Marzano*, 537 F.2d 257 (7th Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977), Marzano was charged with conspiracy, taking money belonging to federally insured banks, and transporting stolen money in interstate commerce, in connection with a theft of more than $3,000,000 from the vaults of a security company. Martin Pollakov, an undercover informant for the Illinois Legislative Investigating Commission who worked at a discount store owned by Marzano's co-defendant Peter Gushi, and who had met with Marzano and Gushi on several occasions, testified at trial. The trial judge refused to allow Pollakov to testify as to his interpretation of statements made by Gushi, and the Court of Appeals upheld the trial judge's exclusion of the testimony:

> Pollakov testified that Gushi told him he was tired of being broke and that he was going to engage in a big score and that he was going to go in with carbines and rifles and if any cop got in the way he was going to 'take him out.' He also testified that Gushi said he would have to 'take four guys out of the way.' Defendant complains because the trial judge did not permit Pollakov to respond to questions as to whether Pollakov interpreted the first statement to mean that Gushi was intending to kill a policeman or to explain the second statement. This was not error. The jury was as able as Pollakov to determine Gushi's meaning. [*Id.* at 268]

Similarly, in the instant case, the jury should have been allowed to draw its own conclusions regarding whether Dicker sought to obtain "phony" documents. At trial, Agent Farrell was permitted continuously to supplement the recorded conversations, which made no actual mention of phony documents, with his opinion that phony documents were being discussed. Farrell simply ascribed his own, illicit meaning to straightforward, potentionally legitimate statements. This admission was surely prejudicial, and was not helpful to a clear understanding of the testimony. The recorded conversations, unlike those at issue in *De Peri*, were perfectly clear without Farrell's "interpretations." Thus, the trial court committed reversible error, and Dicker must be granted a new trial. *See also Butler v. Polk*, 592 F.2d 1293, 1296–97 (5th Cir.1979).

In reaching our result, we have not overlooked the possibility that after the Teaneck meeting Dicker may have heard Farrell refer to the licensing documents as "bad paper." Nor have we ignored Morua's testimony that he thought the paperwork would be illegal and that Dicker on occasions after the Teaneck meeting used phrases which could be regarded as techni-

cal or perhaps code-like. We simply do not regard these circumstances as a proper basis for permitting Farrell's testimony reconstructing the Teaneck meeting or his recasting of Dicker's statement in the van.[7]

The judgment of conviction will be reversed and the matter will be remanded to the district court for further proceedings consistent with this opinion.

---

**7.** The government, though noting that the district judge pointed to Farrell's experience and expertise, does not seek to justify admission of his opinion evidence under Fed.R.Evid. 702. In any event, the evidence could not have been admitted as expert testimony. *See United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir.), *cert. denied,* — U.S. —, —, 108 S.Ct. 355, 357, 98 L.Ed.2d 380, 382 (1987), — U.S. —, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988); *United States v. Hutchings,* 757 F.2d 11, 13 (2d Cir.), *cert. denied,* 472 U.S. 1031, 105 S.Ct. 3511, 87 L.Ed.2d 640 (1985).

As an additional ground for reversal, Dicker argues that the trial court erred in failing to instruct the jury that an adverse inference could be drawn against the government for failing to call Edelstein as a witness. We do not reach this issue as Edelstein may be called at the retrial and in any event the circumstances of the case regarding the calling of Edelstein as a witness may change at the retrial.