IN THE CASE OF


UNITED STATES, Appellee

v.

William A. BYRD, Sergeant
U.S. Army, Appellant

No. 03-0561

Crim. App. No. 9901101

United States Court of Appeals for the Armed Forces

Argued March 2, 2004

Decided June 10, 2004

GIERKE, J., delivered the opinion of the Court, in which EFFRON,
BAKER, and ERDMANN, JJ., joined. CRAWFORD, C.J., filed an
opinion concurring in the result.

Counsel

For Appellant: Captain Gregory T. Rinckey (argued); Colonel
Robert D. Teetsel, Lieutenant Colonel Mark Tellitocci (on
brief); Major Allyson G. Lambert and Captain Mary E. Card.

For Appellee: Captain Edward E. Wiggers (argued); Colonel
Lauren B. Leeker, Lieutenant Colonel Margaret B. Baines, and
Captain Janine P. Felsman (on brief).

Military Judge: Gary J. Holland


**This opinion is subject to editorial correction before final publication**.

Judge GIERKE delivered the opinion of the Court.

Military Rule of Evidence 701 [hereinafter M.R.E.] limits opinion testimony by lay witnesses. This case concerns whether M.R.E. 701 allows a lay witness to interpret what Appellant meant when he wrote certain passages in letters to the witness. We agree with the well-established federal civilian rule that this kind of lay opinion testimony is, with certain limited exceptions, impermissible. Although the military judge improperly allowed a lay witness to offer her opinion about Appellant's meaning in various passages he wrote to her, we find the error to be harmless.

BACKGROUND

Appellant was tried by a general court-martial consisting of officer and enlisted members. Contrary to Appellant's pleas, the members found him guilty of one specification of committing forcible sodomy with his daughter A.B. on divers occasions in violation of Article 125 of the Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 925 (2000). The members found him not guilty of seven other specifications alleging various acts of sexual misconduct with the same daughter. The members sentenced Appellant to a dishonorable discharge, confinement for ten months, reduction to the lowest enlisted grade, and forfeiture of all pay and allowances. The convening authority initially approved the sentence as adjudged.

The Army Court of Criminal Appeals set aside the original convening authority's action in an unpublished opinion. The convening authority then again approved the sentence as adjudged, but retroactively waived forfeitures for a six-month period. The Army Court then affirmed the findings and sentence in an unpublished opinion and Appellant filed a timely petition for grant of review. We granted the petition to address the permissible scope of lay opinion testimony. See 59 M.J. 215 (C.A.A.F. 2003). This issue does not involve, and we do not address, the distinct question of when a witness may testify about how another person's communications affect the witness.

## FACTS

Appellant was charged with sexual offenses involving his daughter A.B. when she was ten and eleven years old. While Appellant was confined by civilian authorities before trial, he wrote two letters to his wife, as well as another letter to their daughter A.B. The defense moved in limine to exclude those letters and Mrs. Byrd's testimony about them.

The defense argued that any testimony about the letters' content would be speculative and that the testimony's prejudicial effect would outweigh its probative value. At a hearing on this motion, Mrs. Byrd testified that she recognized the handwriting on the letters as Appellant's. She also testified that she had known Appellant for about sixteen years

and had been married to him for eight years. She then provided her interpretation of various phrases appearing in the letters. The trial counsel argued that the letters and Mrs. Byrd's opinion testimony were admissible to show that Appellant was threatening his wife to impede his family's cooperation with the prosecution. The trial counsel also noted that the Government intended to present expert testimony from a psychologist concerning how "statements can be used as threats designed to have a spouse not go forward with charges."

In ruling on the motion to exclude Mrs. Byrd's testimony about the letters, the military judge first noted that the letters themselves were admissible as "admissions by the accused." The military judge then made a contingent ruling that Mrs. Byrd's testimony would become relevant if the Government presented expert testimony concerning accused individuals' use of psychological or financial pressure to convince their victims to recant.[1] The military judge specifically concluded that "Mrs. Byrd's opinion as to what the accused was trying to say to her" would be helpful to the members.

Mrs. Byrd ultimately testified about the letters during the Government's case in chief. The trial counsel directed Mrs.

---

[1] The Government satisfied this condition by presenting the testimony of a civilian psychiatrist from Fort Campbell, though curiously the Government called him as a witness after Mrs. Byrd had already testified.

Byrd to read various passages from the letters, which had not yet been published to the members. After the members heard each passage, the trial counsel elicited additional information from Mrs. Byrd, including her opinion about what Appellant meant when he wrote some of the passages. The defense now challenges the admissibility of her responses concerning eight specific passages.

## DISCUSSION

M.R.E. 701 establishes a two-part test for admissibility of lay opinion: (1) the opinion must be rationally based on the witness's perception; and (2) the opinion must be helpful to the determination of a fact in issue. Like other evidentiary rulings, a military judge's application of M.R.E. 701 is reviewed for an abuse of discretion. See United States v. Littlewood, 53 M.J. 349, 353 (C.A.A.F. 2000). A trial judge's ruling is "entitled to 'due deference.'" United States v. Maxwell, 38 M.J. 148, 152 (C.M.A. 1993) (quoting United States v. Strozier, 31 M.J. 283, 288 (C.M.A. 1990)). Accordingly, we will reverse for an abuse of discretion only "if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law." United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F. 1995). In this case, we find such an abuse of discretion.

United States v. Byrd, No. 03-0561/AR

Application of the lay witness opinion rule, M.R.E. 701, to interpretations of the meaning of another person's communications is an issue of first impression in military law. Accordingly, we will seek guidance from judicial interpretations of Federal Rule of Evidence 701, the model for its military counterpart.[2]  See Manual for Courts-Martial, United States (2002 ed.), Analysis of the Military Rules of Evidence A22-49 ("Rule 701 is taken from the Federal Rule without change."); see also id. at A22-2, Analysis of M.R.E. 101 ("While specific decisions of the Article III courts involving rules which are common both to the Military Rules and the Federal Rules should be considered very persuasive, they are not binding.").

The general rule in federal civilian courts is that "[l]ay witnesses are normally not permitted to testify about their subjective interpretations or conclusions as to what has been said."  United States v. Cox, 633 F.2d 871, 875 (9th Cir. 1980);

---

[2] This case was tried before the 2000 amendment to Federal Rule of Evidence 701, which prohibited lay opinion testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  See Amendments to Federal Rules of Evidence, 529 U.S. 1189, 1194-95 (2000).  While the 2002 edition of the Manual for Courts-Martial does not reflect the change, the 2000 amendment to Federal Rule of Evidence 701 now applies in courts-martial through operation of M.R.E. 1102.  A proposed amendment to the Manual for Courts-Martial specifically incorporates the change to Rule 701.  See Notice of Proposed Amendments to the Manual for Courts-Martial, United States, (2000 ed.) and Notice of Public Meeting, 66 Fed. Reg. 30,431 (proposed June 6, 2001).  Other proposed amendments incorporate changes to M.R.E.s 103(a)(2), 404(a), 701-702, and 803(6) that have already taken effect through operation of M.R.E. 1102.

United States v. Byrd, No. 03-0561/AR

see also United States v. Green, 44 M.J. 631, 639 n.3 (C.G. Ct.
Crim. App. 1996) (O'Hara, J., concurring).  Such lay
interpretations are admissible "only if rationally based on
perception of a witness and helpful either to an understanding
of the testimony of the witness on the stand or to the
determination of a fact in issue."  Cox, 633 F.2d at 875.[3]  For
example, a lay witness may be permitted to interpret "coded or
'code-like' conversations."  United States v. Dicker, 853 F.2d
1103, 1108 (3d Cir. 1988).

---

[3] The First, Third, Fifth, Seventh, and D.C. Circuits follow
rules similar to the Ninth Circuit's formulation in Cox.  See,
e.g., United States v. Saccoccia, 58 F.3d 754 (1st Cir. 1995);
United States v. Dicker, 853 F.2d 1103, 1108-09 (3d Cir. 1988);
United States v. White, 569 F.2d 263, 267 (5th Cir. 1978);
United States v. Marzano, 537 F.2d 257, 268 (7th Cir. 1976);
DeLoach v. United States, 307 F.2d 653, 655 (D.C. Cir. 1962)
(pre-Federal Rules of Evidence case); see also United States v.
Coleman, 284 F.3d 892, 894 (8th Cir. 2002) (upholding police
officer's testimony interpreting defendant's "drug jargon");
United States v. People, 250 F.3d 630, 640-42 (8th Cir. 2001)
(holding that FBI agent's interpretations of codefendants'
conversations were inadmissible under Fed. R. Evid. 701).  The
Sixth Circuit, however, maintains that a witness may "testify in
the form of an opinion as to his understanding of a defendant's
statement."  United States v. Graham, 856 F.2d 756, 759 (6th
Cir. 1988); accord United States v. Elder, 90 F.3d 1110, 1114
(6th Cir. 1996).  See also United States v. Awan, 966 F.2d 1415,
1430 (11th Cir. 1992) (interpreting Fed. R. Evid. 701 to allow a
witness to clarify conversations that are abbreviated, composed
of unfinished sentences, or containing ambiguous references to
events that were clear only to the communication's
participants).

7

<u>United States v. Byrd</u>, No. 03-0561/AR

The Second Circuit has emphasized the foundational requirements that the proponent must satisfy before a witness's interpretation of another person's meaning becomes admissible. "In order to allow lay opinion testimony interpreting a facially coherent conversation . . ., the government would have to establish a foundation that called into question the apparent coherence of the conversation so that it no longer seemed clear, coherent, or legitimate." <u>United States v. Garcia</u>, 291 F.3d 127, 142 (2d Cir. 2002).

We agree with the general prohibition of lay opinion testimony interpreting facially coherent communications. "Where terms are capable of being understood by the layman, and where the jury is capable of interpreting the language or slang involved, lay witness opinion testimony is improper, as is the lay witness's conclusion or interpretation of the conversation." <u>State v. Webb</u>, 792 P.2d 1097, 1100 (Mont. 1990).

For a lay opinion interpreting another person's meaning to be admissible, the proponent must establish that the witness has some special basis for determining the speaker's true meaning. <u>See generally</u> David A. Schlueter, et al., <u>Military Evidentiary Foundations</u> 272-73 (2d ed. 2000). Once that foundation is laid, the witness "may clarify conversations that are abbreviated, composed of unfinished sentences and punctuated with ambiguous references to events that were clear only to the conversation

United States v. Byrd, No. 03-0561/AR

participants," United States v. Sneed, 34 F.3d 1570, 1581 (10th

Cir. 1994), or which include code or code-like language.

Dicker, 853 F.2d at 1108.  When such permissible testimony is

presented, the "accuracy of those perceptions is a question for

the [members]."  Sneed, 34 F.3d at 1581.

These general rules can be applied to sort Mrs. Byrd's

testimony concerning her husband's letters into three

categories:

(1)  Mrs. Byrd's opinions concerning Appellant's meaning in

several passages that were facially coherent were inadmissible.

(2)  Mrs. Byrd's opinions concerning Appellant's meaning

when he wrote certain ambiguous statements were also

inadmissible because they were unaccompanied by any

particularized demonstration that she had a basis for

determining Appellant's true meaning.  It was not enough to show

that Mrs. Byrd was familiar with Appellant's handwriting and had

corresponded with him in the past.  As the proponent of this

testimony, the Government was required to demonstrate that Mrs.

Byrd had some basis for knowing Appellant's intended meaning for

the particular phrases that she purported to interpret.

(3)  Mrs. Byrd's testimony providing background information

concerning references in the letters to other events was

admissible.

We will now address Mrs. Byrd's testimony concerning each of the eight passages.

### Passage One

Appellant's first challenge is to Mrs. Byrd's testimony interpreting a portion of Appellant's letter of June 24, 1999, that stated, "Well, I will.  I won't strike until you tell me your intentions.  My thinking is, you care for me and want to help me get out of this.  That's what I think.  I'll wait till [sic] you decide the other."

During her testimony on the merits, Mrs. Byrd explained, "I had always been afraid that he would get mad and take the money out of the bank and then I wouldn't have any money to pay the bills and take care of the kids."  She then provided this interpretation of the passage:

> I took it that if I didn't – that if I didn't tell –
> when he found out which way I was going to tell – say
> it did happen or say it didn't happen, he was going to
> wait and then based upon that was what he was going to
> do, based upon whichever way that I went.  And that
> because of how I felt about him, that I would keep on
> doing what I had been doing, trying to protect him.

The trial counsel then asked, "When you say it did happen or didn't happen, what are you talking about?"  Mrs. Byrd answered, "I'm talking about the sexual abuse.  If we kept saying that it did not happen and if I kept not cooperating."  The trial counsel followed up by asking, "Then if you kept on doing that, what would he do?"  Mrs. Byrd answered, "If I kept on not

10

cooperating with the authorities, then things would continue on as the same that he would give me financial support."

Appellant's meaning in this passage is unclear. Mrs. Byrd interpreted it as a promise of continued financial support in return for not cooperating with the prosecution. That interpretation is not clear from the communication itself. Accordingly, Mrs. Byrd's interpretation of Appellant's meaning was admissible only if supported by an evidentiary foundation to establish that Mrs. Byrd had some means, such as prior usage, to determine Appellant's intent when he wrote these words. However, during the motions hearing, the Government did not lay any foundation to demonstrate that words or phrases used in this passage had some established meaning in the couple's communications. Thus, when the military judge ruled on the motion, he erred when he held that this testimony was admissible. Nor did the Government lay the missing foundation later when Mrs. Byrd testified during the Government's case-in-chief and in rebuttal. Mrs. Byrd's testimony concerning the first passage therefore fell into the second category discussed above and was inadmissible.

### Passage Two

Also in his June 24 letter, Appellant wrote, "Even if I did go away for the rest of my life, I'll be unable to help financially in prison, but I'll help mentally." The trial

counsel asked Mrs. Byrd, "What did you think he meant when he said, 'go away for the rest of my life?'" Mrs. Byrd answered, "That he thought he would go to jail. He would go to prison." The trial counsel then asked, "Why would he go to jail?" She responded, "If he was found guilty of the charges of abuse."

The meaning of this passage is plain on its face. Thus, testimony about this passage fell into the first category discussed above and was inadmissible. Mrs. Byrd's interpretation was particularly problematic because it subtly changed the passage's meaning. While Appellant's sentence was conditional -- "if I did go away" -- she testified that "he thought he would go to jail."

### Passage Three

The final passage at issue from the June 24 letter read, "Tell the kids I love them very much. I'm going to do time, no doubt." Mrs. Byrd interpreted this passage to mean "[t]hat he thought he was going to go to prison." Like the previous passage, Appellant's meaning is plain, and the military judge erred by allowing Mrs. Byrd to "interpret" it.

### Passage Four

The first passage at issue from Appellant's June 26 letter to his wife stated, "If [A.B.] would only write to me that she's going to stick by me and in court say it didn't happen." Mrs. Byrd interpreted this passage to mean that "he wants her not

[sic] to say that it didn't happen." Again, the passage's meaning is plain on its face, and the military judge erred by allowing Mrs. Byrd to offer her opinion concerning its meaning.

### Passage Five

Appellant also wrote in his June 26 letter:

> The main reason I told you what I did in the [car] before I left was to gain trust and answer your questions. I also did it because I know if I tell you the deal, there is a chance for our relationship. I mean, you did say so before, so I'm going to keep that in mind.

The trial counsel asked Mrs. Byrd to explain the reference to the conversation in the car. She answered:

> It was a conversation that took place when we were in the car and I was taking him to Fort Campbell. And we were talking and he said I could ask him anything I wanted and he would tell it to me truthfully. And I asked him did him [sic] and [A.B.] have sex again. . . . And he told me yes, they had. And the reason that it had happened was because [A.B.] wanted him to and that she was going to tell me that it happened anyway. And so he went ahead and did it.

During Mrs. Byrd's explanation of passage five, the trial counsel also asked, "[W]hen he says, 'I mean you did say so before, so I'm going to keep that in mind,' what is he talking about there?" Mrs. Byrd answered, "I had told him that if he told me the truth, that – before, when I had found out, that I wouldn't leave him, that we you know, we could go to get some counseling and we could work through this." The trial counsel then clarified that Mrs. Byrd was referring to her actions after A.B. first revealed Appellant's abuse of her.

13

Mrs. Byrd's testimony concerning this passage was a permissible explanation of an "ambiguous reference[] to events that were clear only to the" letter's author and recipient. Sneed, 34 F.3d at 1581. The Government's presentation of her testimony concerning Appellant's remarks during a previous conversation was also independently permissible as an account of admissions by a party opponent. See M.R.E. 801(d)(2).

## Passage Six

In his June 26 letter to his wife, Appellant also wrote, "God, I love my children. I want to be a part of their life so bad. How can I . . ., making $15.00 a month the rest of my life." Mrs. Byrd interpreted this passage to mean "[t]hat if he goes to prison, he's only going to be making $15.00, I guess a day or whatever. And he wouldn't be able to help us. He wouldn't be able to take care of the family."

The meaning of passage six appears to be clear. Thus, it fell into the first category discussed above, and allowing testimony to interpret it was error. To the extent that this passage is ambiguous, that ambiguity does not appear to implicate any special knowledge of its intended reader. Neither during the motions hearing nor during Mrs. Byrd's testimony before the members did the Government lay a foundation to establish that Mrs. Byrd had any unique ability to interpret this particular passage. Her testimony was simply conjecture.

14

Thus, even if the interpretation of this passage did not fall into the first category discussed above, it fell into the second. In either case, Mrs. Byrd's interpretation of passage six constituted impermissible lay opinion testimony.

Passage Seven

Appellant's June 26 letter also stated, "I'd do anything for our marriage, even counseling or pretty much anything you or [A.B.] want[]. Not guilty will stay in effect. Everything else, I'll do for the family and their wishes."

The trial counsel asked Mrs. Byrd, "When he says he'll do anything for the marriage, what is he talking about?" She answered, "I had told him that I wanted us to get counseling." The trial counsel then asked, "When did you tell him that?" She replied, "I had been telling him the whole time this was going on. I had told him that we needed to get counseling." Mrs. Byrd explained that Appellant "said that we couldn't get counseling. The only counseling we need was each other, because if we told – if we went somewhere and told them what was going on then they would have to act on what we told them." She also testified that she meant both marriage counseling and counseling concerning the abuse.

Mrs. Byrd's testimony concerning this passage was permissible for the same reasons discussed in connection with passage five, above. The Government was permitted to elicit

15

Mrs. Byrd's explanation of ambiguous references that were clear only to the letter's author and recipient, and the testimony concerning Appellant's remarks in earlier conversations was admissible as an account of admissions by a party opponent.

## Passage Eight

The final passage at issue from Appellant's June 26 letter stated, "They'll see me of course.  I'll be in prison then, but they know I love them."  The trial counsel asked Mrs. Byrd, "[W]hy would he be in prison?"  She replied, "If he got -- if he got found guilty of the charges of the sexual abuse."

The meaning of passage eight is plain on its face.  Mrs. Byrd's testimony concerning the passage, therefore, fell into the first category discussed above and was inadmissible.

## Summary

We hold that the military judge properly allowed Mrs. Byrd to provide background information concerning passages five and seven.  However, we hold that the military judge erred by allowing the Government to present her lay opinions concerning Appellant's meaning when he wrote the remaining six passages.

## Prejudice Analysis

Having found that the military judge erroneously allowed Mrs. Byrd's testimony concerning six of the passages, we will test for prejudice.  "We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the

Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999). The burden of demonstrating harmlessness rests with the Government. United States v. Baumann, 54 M.J. 100, 105 (C.A.A.F. 2000). In this case, the Government easily carries this burden.

This was a hard-fought case, involving extensive evidence presented by both the Government and the defense. The Government's case included the testimony of A.B. herself concerning her father's sexual offenses. A.B.'s younger brother testified that he saw Appellant and A.B. in the shower together naked. A.B.'s younger sister testified that she once looked through a crack in their home's master bedroom door and saw Appellant kissing A.B. Appellant's wife testified that Appellant twice admitted to her that he did sexually abuse A.B.

The defense case included Appellant's explicit denial of the offenses, extensive good military character evidence, a limited alibi defense, and evidence about A.B.'s recantation of her allegations in the midst of child custody hearings.

While the contentious nature of the case militates in favor of finding prejudice, other aspects of this case convince us that the error was harmless. Mrs. Byrd's inadmissible testimony concerning the six passages was of limited materiality. Other

17

aspects of her testimony concerning Appellant's admissions and a request from Appellant to destroy evidence were, if believed, far more damaging to the defense.

Nor was Mrs. Byrd's testimony about the letters a focal point of the case. For example, during his closing argument to the members, the trial counsel emphasized not Mrs. Byrd's interpretation of the letters, but rather the language of the letters themselves and Appellant's testimony about the letters. In the larger context of the Government's case, Mrs. Byrd's impermissible opinions concerning six passages in Appellant's letters were insignificant. To the extent that the letters influenced the findings, it was Appellant's own words rather than Mrs. Byrd's interpretations of those words that hurt the defense. Thus, Appellant was not prejudiced by the military judge's erroneous rulings.

CONCLUSION

The decision of the United States Army Court of Criminal Appeals is affirmed.

CRAWFORD, Chief Judge (concurring in the result):

The majority is incorrect to find an abuse of discretion, when the "courts have been very liberal in admitting witnesses' testimony as to another's state of mind . . . ." United States v. Hoffner, 777 F.2d 1423, 1425 (10th Cir. 1985). See John Hancock Mut. Life Ins. Co. v. Dutton, 585 F.2d 1289, 1294 (5th Cir. 1978)(admitted testimony of decedent's daughter that she did not believe that the decedent thought his wife would ever shoot him). Indeed, the preference under the Military Rules of Evidence [hereinafter M.R.E.] is for admission of evidence unless it is not legally and logically relevant. Appellant's wife, Mrs. Byrd, could certainly testify as to her reasonable interpretation of the letters, a series of veiled threats by Appellant aimed to influence his wife's testimony and the testimony of the victim, A.B.

To determine the admissibility of opinion testimony by lay witnesses, M.R.E. 701 requires examination of several factors, some of which the majority ignores and are set forth below. The majority also did not consider the M.R.E. 401-404 rules, the standard of review, or the principles behind M.R.E. 701. Moreover, many cases cited by the majority[1] would permit the

---

[1] See, e.g., United States v. Coleman, 284 F.3d 892 (8th Cir. 2002); United States v. Dicker, 853 F.2d 1103 (3d Cir. 1988)(and cases cited therein). See also United States v. Garcia, 291 F.3d 127, 140-42 (2d Cir. 2002); United States v. Novaton, 271 F.3d 968, 1007-09 (11th Cir. 2001); United States v. De Peri, 778 F.2d 963, 977-78 (3d Cir. 1985).

United States v. Byrd, No. 03-0561/AR

admission of these coded veiled messages by Appellant.
Certainly, the judge's decision in admitting the letters was not
an abuse of discretion.

Lay opinions generally are inadmissible. Nevertheless, the
rule against lay opinions is not an absolute rule and is subject
to relaxation. M.R.E. 701 sets forth the prevailing practice
and is a rule of preference rather than a rule of exclusion. 1
John W. Strong, et al., McCormick on Evidence § 11 at 48 (1999).
M.R.E. 701 provides:[2]

> If the witness is not testifying as an expert,
> the testimony of the witness in the form of opinions
> or inference is limited to those opinions or
> inferences which are (a) rationally based on the
> perception of the witness and (b) helpful to a clear
> understanding of the testimony of the witness or the
> determination of a fact in issue, and (c) not based on
> scientific, technical, or other specialized knowledge
> within the scope of Rule 702.

This case concerns the first two prongs of this rule. The third
prong and the amendments to M.R.E. 702 were added in December
2000 "to eliminate the risk that the reliability requirements
set forth in [M.R.E.] 702 would be evaded through the simple
expedient of proffering expert in lay witness clothing."
Advisory Committee Notes to Federal Rules of Evidence at 120.

Part of the first prong restates the personal knowledge
requirement in M.R.E. 602. That is not an issue here. Another
portion of the first prong, which is at issue, is the

---

[2] See Amendments to the Federal Rules of Evidence, 529 U.S. 1189,
1194-95 (2000); M.R.E. 1102.

United States v. Byrd, No. 03-0561/AR

"rationally based" aspect, that is, the opinion must be a reasonable inference drawn from the facts.  The second prong requires the testimony to be helpful to the factfinder's "clear understanding of the testimony of the witness."  As to this prong, the courts have been surprisingly liberal in admitting lay opinions about the state of mind of third persons.  Winant v. Bostic, 5 F.3d 767 (4th Cir. 1993)(witness concluded that land developers never intended to do what they promise); United States v. Rea, 958 F.2d 1206, 1215 (2d Cir. 1992)("There is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others.  Accordingly, these rules do not, in principle, bar a lay witness from testifying as to whether a defendant in a criminal prosecution had the requisite knowledge.")(citations omitted); United States v. Hoffner, 777 F.2d 1423, 1425 (10th Cir. 1985).

M.R.E. 701 allows the witness to draw reasonable inferences based on his or her experience and knowledge of the accused.  In this case, Appellant's wife gave her overall impressions simplifying a very detailed letter.  "Knowledgeable witnesses can easily satisfy the rational basis and helpfulness criteria in providing interpretative opinions on the mental states of others."  Christopher B. Mueller & Laird C. Kirkpatric, Evidence § 7.4 at 615 (3d ed. 2003).

When it is impractical for a witness to verbalize all the data, the witness's inferential testimony is generally

3

admissible.  Id. at 614-15.  Lay people have been able to express opinions on identity, conduct, competence, feelings, light or darkness, sound, size, weight, distance, speed, and an endless number of other things.  McCormick, supra, at § 11 at 47-48 n.22 (citing Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 417 (1952)).  The Federal Rules of Evidence Advisory Committee Note observes:

> The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction than broad assertion, and a lawyer can be expected to display his witness to the best advantage.  If he fails to do so, cross-examination and argument will point up the weakness.

This is especially true where the witness attempts to choose up sides.  Id.

The courts have been more receptive to lay opinions about the state of mind of third parties.  Id. at 50.  A number of courts have allowed a person to testify about another's state of mind, i.e., grief, intent, and so forth.  This is true so long as it is clear that the witness is expressing an opinion that can be treated like other witnesses, and the testimony can be rejected.  Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir. 1997)(witness cited "objective facts" supporting opinion); Hoffner, 777 F.2d at 1425-26)("Courts have been very liberal in admitting witnesses' testimony as to another's state of mind if the witness has had sufficient opportunity to observe the accused so as to draw a rational conclusion about the intent

4

of the accused. . . . Determination of the preliminary questions of perception and helpfulness are within the discretion of the trial court."); United States v. McClintic, 570 F.2d 685, 690 (8th Cir. 1978)(witness could testify that the defendant knew the goods he received were fraudulently obtained when the witness had heard the defendant discussing the scheme for obtaining the goods).

The standard of review for evidentiary rulings is whether the judge abused his discretion. The judge in this case did not. The abuse of discretion standard requires not that the judge was wrong, but rather was clearly wrong. As we have stated, it is not that the judge is maybe wrong or probably wrong, but rather "it must strike a cord of wrong with the force of a five-week-old, unrefrigerated dead fish." United States v. French, 38 M.J. 420, 425 (C.M.A. 1994)(quoting Parts & Electric Motors Inc. v. Sterling Electric, Inc., 866 F.2d 228, 233 (7th Cir. 1988)).

At a session pursuant to Article 39(a), Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. 839(a) (2000), the trial counsel laid a foundation for Mrs. Byrd's opinions by establishing that she had known Appellant for fourteen years and had been married to him for eight. Additionally, Mrs. Byrd was familiar with Appellant's handwriting from checks, letters, and other documents. At the Article 39(a) session, the judge overruled the defense's objection, based on M.R.E. 403 and

speculation, to Mrs. Byrd's opinion.  Nevertheless, prior to admitting her opinion at trial, the trial counsel laid an additional foundation by admitting and playing the taped conversations from the answering machines.  Additionally, the trial counsel selected only the passages highlighted and mentioned below.

Prior to the testimony concerning these passages, the prosecution, without defense objection, played a number of messages left by Appellant on his wife's answering machine.  During these conversations, he stated:

> If my daughter wants that furniture, she can have it.
> I'm not getting furniture for you.  I'm getting it for
> my daughter.  'cause I'm not throwing smoke up
> nobody's butt.  I'm dead serious.  You need to get
> with me.  Trust me.  Or say bye bye to the furniture.

> I want to be sure that you're – you're still good to
> go.  No matter what you feel, it's – the bottom line
> is, I need you as much as I think you need me.  So
> don't get personnel [sic].  Let's just stick with what
> we need to do to get things done.

These taped messages from Appellant provided not only a factual context for many of Appellant's written remarks, but also evidenced a level of spousal and familial communication that, over a period of 8-14 years, was certainly sufficient foundation for the opinions Mrs. Byrd expressed on the stand.

Moreover, Appellant evinced a tendency to speak in cryptic, obfuscatory terms.  A majority of courts permit a witness to interpret "coded or 'code-like' conversations."  United States v. Dicker, 853 F.2d 1103, 1108-09 (3d Cir. 1988).  Appellant was

6

clearly trying to convey a deeper meaning via suggestion, oblique reference, and innuendo.  Indeed, this is a case of a husband not speaking in plain terms, but coded language.  Who best to interpret what he means than a wife who has known him for several years?  It reminds me of the 1945 German request for the surrender of Bastogne when the 101st Airborne Division Commanding General said, "Nuts."  I suppose we could ask the people who knew the General what "nuts" meant.  Would that be admissible?  That is what this case is about.  In short, to the extent that a witness had sufficient familiarity with Appellant's communicative form, the military judge correctly ruled that it would be helpful to the members to have that witness explain what Appellant was likely talking about in his letters.

The tape and its foundation were heard by the members <u>before</u> they heard Mrs. Byrd's opinion on the letters (which had been admitted without objection just before the tape played).  Thus, by the time the questioned opinion came before the members, there was a much greater foundation than there had been in the Article 39(a) session.  After the members heard the tape, but before they heard her opinions on the letters, Mrs. Byrd gave her opinion on what other passages on the tape meant.  Some of these cover the same subject matter as the letters.

Mrs. Byrd's testimony, in total, added significant detail to the factual setting against which her opinions were set

before the members, and reinforced a level of familiarity with her husband's communicative habits consistent with a lay opinion under M.R.E. 701.

Before hearing the questioned opinions, the members also heard Mrs. Byrd testify to the reasonable inferences that could be drawn from the taped telephone messages from Appellant which were similar in meaning to the letters and issue in this case. She testified that Appellant had "kind of used the furniture almost like a bargaining tool." After hearing the tape, Mrs. Byrd explained, over objection, Appellant's vague references to the furniture, by saying, "I took it that he had called Helig Meyers and told them to come pick up the furniture and that [A.B.] was the only one that was going to be able to decide if we were going to keep the furniture" and "if she didn't keep saying . . . that the abuse didn't happen, then he was going to have them come pick up the furniture." Explaining Appellant's taped remark that "if you ever do anything for me on Thursday morning, you can take me up there with A.B." Mrs. Byrd said, without objection, that A.B. was to testify at a grand jury hearing on Thursday and Appellant was asking to ride along back to Cadiz, Kentucky. When asked to explain Appellant's taped remark that he "needs to get some answers to some things," Mrs. Byrd testified, without objection, that that meant their "relationship, the divorce, how we were going to testify at the

[Article 39(a)] hearing." She felt that "he was laying the choice at the feet of a child."

Mrs. Byrd testified that "since the furniture was in his name and not in mine, even thought [sic] I was making the payments, they could come take it out anytime he called." Mrs. Byrd testified that she had known Appellant 13-14 years and had been married to him for 8. After getting married, they had lived at Fort Sill, Baumholder, Huntsville, and Cadiz. Mrs. Byrd lived in Huntsville alone for nine months while Appellant was in Bosnia.

As to each passage the judge admitted, I offer the following views.

Passage One

I agree with the majority that "Appellant's meaning in this passage is unclear," but only to someone who did not know him over a period of time and had not engaged in other conversations with him. Mrs. Byrd had already testified that Appellant was the primary breadwinner and controlled the family funds. And if A.B. didn't testify his way, the family would suffer economically. That is exactly what this passage meant. Thus, her testimony was admissible on that point and satisfied all three requirements of M.R.E. 701.

Passage Two

The same rationale applies for the admission of her testimony concerning this passage. It is clear that he would be

"unable to help financially," meaning that if she wanted financial help, A.B. should not testify as to what she has been telling the investigators.

### Passage Three

As to this passage, it is permissible for the wife to say, or interpret this passage to mean, that he is going to go to prison unless the family helps him -- again satisfying all three requirements of M.R.E. 701. The judge's ruling is not an abuse of discretion. The language as to this passage, "she's going to stick by me," and in court say it didn't happen, was consistent with her other testimony. She had already testified that Appellant had at least implied that he wanted A.B. to testify favorably for him. Thus, this evidence was already present, and it was not error to repeat this testimony.

### Passage Five

This passage was helpful to the factfinders because Mrs. Byrd began her testimony on direct examination by describing Appellant's admission to her in the car at Fort Campbell. Because there is nothing new here about which she had not already testified, there could be no error.

### Passage Six

Again, this showed Mrs. Byrd's keen insight in interpreting Appellant's reference to making $15 a month for the rest of his life as an intimation that he would no longer be able to support the family if they did not testify favorably.

Passage Seven

Mrs. Byrd's opinion that Appellant is referring to counseling is benign and irrelevant.  What hurts Appellant is Mrs. Byrd's recitation of his admission at the counseling session which is admissible in its own right under M.R.E. 801(d)(2), and thus is not error.

Passage Eight

The prosecutor's question to Mrs. Byrd was, "[W]hy would he be in prison?"  Mrs. Byrd answered, "[I]f he got found guilty of the charges . . . ."  This statement was both harmless and irrelevant under the circumstances.

For these reasons, I concur only in the result of the lead opinion.