No. 89-413

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

       Plaintiff and Respondent,

  -vs-

FREDERICK ROD WEBB,

       Defendant and Respondent.

APPEAL FROM:   District Court of the Nineteenth Judicial District,
                In and for the County of Lincoln,
                The Honorable Robert Keller, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

           Donald L. Shaffer, Attorney at Law, Libby, Montana
           James A. Manley, Attorney at Law, Polson, Montana

      For Respondent:

           Honorable Marc Racicot, Attorney General, Helena,
           Montana
           Patricia Schaeffer Jordan, Assistant Attorney
           General, Helena, Montana
           Scott B. Spencer, County Attorney, Lincoln County
           Libby, Montana

Submitted on Briefs:  April 5, 1990

Decided:  May 24, 1990

Filed:

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Defendant Frederick Webb was convicted of criminal sale of dangerous drugs in the Nineteenth Judicial District, Lincoln County. Defendant appeals, alleging several errors by the District Court, including improper admission of expert opinion testimony. We reverse and remand.

Defendant presents several issues for review. Only the following issue will be addressed, however, since it is controlling and we find the District Court erred:

> Did the District Court improperly allow opinion testimony
> by a deputy sheriff, as to the meaning and conclusions
> to be drawn from a tape-recorded conversation?

This case arose out of an undercover drug investigation conducted in Lincoln County, Montana during the summer of 1988, which resulted in the prosecution of a number of persons for sale of dangerous drugs. As part of the investigation the Lincoln County Sheriff's Department hired Mike Hewson to purchase narcotics as an undercover agent. The Sheriff's Department provided surveillance for Hewson, who would set up a deal and then contact either Detective Donald Bernall or Detective Klint Gassett of the Sheriff's Department to obtain backup.

On the morning of June 27, 1988, Hewson went to the home of Vicki LaCoss in Libby. Hewson had met with Detective Gassett who gave Hewson five $20 bills for a drug buy and made sure Hewson was wearing a transmitter wire. Gassett monitored the activity from a vehicle parked some distance from LaCoss's home.

When he arrived at the LaCoss residence, Hewson, who had never

been there before, found Vicki LaCoss and her three-year-old daughter watching television. A short while later the defendant arrived, introductory pleasantries were exchanged, and defendant and Vicki LaCoss began playing cribbage, continuing an on-going competition. Hewson remained at the LaCoss residence for a short time. During this time, the State alleges a drug transaction took place where defendant sold Hewson a gram of methamphetamine ("crank") for $90 and Hewson gratuitously shared some of the drug with Vicki LaCoss for her part in setting up the deal. As he was leaving the house, Hewson read the license plate number of defendant's blue van into the surveillance transmitter and Officer Gassett ran a check which revealed the van belonged to the defendant. Hewson later met with Officer Bernall to give him the drugs.

On September 14, 1988, defendant was arrested and charged by information with two counts. The first count was dismissed, but the second count, charging defendant with the sale of dangerous drugs, was tried to a jury in Lincoln County on February 22-24, 1989. The State's version of what transpired on June 27, 1988 differs greatly from defendant's version. Hewson testified that he had met LaCoss once before and had, by a telephone call, made prior arrangements to complete a drug buy at LaCoss's home on the morning of June 27. LaCoss testified that she had not invited Hewson to her home that morning nor had she made prior arrangements for a drug transaction. LaCoss also stated she had not invited defendant to her house on the morning of June 27. Defendant said

3

he had come to LaCoss's home to inquire if she was still planning a dinner party for that evening.

Hewson testified that he bought a "bindle" containing one gram of crank from defendant for $90 and that Hewson and LaCoss then went to a back area of the house where he gave LaCoss some of the drugs. Hewson also testified that there was some discussion between him and the defendant regarding the sale of the crank.

LaCoss's version of the transaction differs significantly from Hewson's testimony. LaCoss testified that Hewson brought the drugs to her house; that there was no conversation regarding a drug transaction in defendant's presence; that defendant never saw or was in any way involved in any drug transaction; and that she and Hewson shared drugs in a back area of her house out of defendant's presence.

Defendant testified there was no drug transaction nor was any money exchanged in his presence. Defendant also testified he did not see any drugs in the house nor was he aware that Hewson and LaCoss shared drugs in another part of the house on June 27.

A tape, recorded by surveillance, of the activities at the LaCoss home on June 27, 1988 was introduced into evidence and played for the jury. Different versions of the recorded conversation transcribed by the State and the defense were also introduced. On rebuttal, the State called Officer Gassett who was permitted, over defendant's objection, to give his opinion regarding the meaning of certain parts of the conversation on the tape.

4

On February 24, 1989, the jury returned a verdict of guilty from which defendant now appeals.

Did the District Court improperly allow opinion testimony by a deputy sheriff, as to the meaning and conclusions to be drawn from a tape-recorded conversation?

Much of the electronic surveillance tape recording was unintelligible. Neither the State's nor the defendant's transcribed version of the tape makes any mention of drugs or any sort of drug transaction. The State, however, contended at trial that parts of the conversation alluded to a drug transaction. In an effort to support the contention the State offered the testimony of Officer Gassett, the detective who monitored the June 27 events at the LaCoss home by electronic surveillance.

Officer Gassett was allowed to give his opinion as to the significance of certain parts of the recorded conversation between Hewson, LaCoss, LaCoss's three-year-old daughter, and the defendant:

Q. And that is transcribed as Mike Hewson or we waited for him, Vicki LaCoss?

A. Uh-huh.

Q. Then there is a thing by [the daughter]. Then Mike Hewson, are you waiting for him. Vicki LaCoss, uh-huh.

Q. Okay. Does that sound to you like conversations that would tie into a drug deal?

A. Yes, sir.

Q. And why is that?

A. Waiting for in my opinion, they are waiting for delivery of the drug or whoever is going to bring it over.

5

. . .

Q. And it says, Rick Webb says, yes, I kind of thought that you would like that. Now, is that consistent? Does that mean anything to you or do you feel that has any significance?

A. I feel that it has significance.

Q. What is that?

A. In that they are talking about the price and reference to crank; what he paid, $90.00, comes out -- usually a lot of times, you pay $100.00 for it.

Q. So you thought of that as being a significant reference to price and in what regard meaning what?

A. It is cheaper than expected.

. . .

Q. Okay. Now, when we listened to the tape and listened to the tape, it appeared there was people talking at that time?

A. Yes, sir.

Q. And were they talking loudly, softly or what?

A. Softly.

Q. And is there any significance to people talking real softly in relation to drug deals?

A. Yes, sir.

Q. What is that?

A. In that lots of times in most times that I have been involved with drugs and when they get down to actually talking about the drugs, it doesn't matter where they are at, how may people there are present, they tend to talk in soft, low tones, not loud.

Q. Okay. And is there any significance to people at the point of the transaction talking softly and low tones of voice?

A.   I think this is when, yes.

Q.   And why is that?

A.   I think this is where the drugs is being exchanged.

. . .

Q.   And then there is another thing at 55 [referring to tape recorder counter number] then, [the daughter], and then 58 Mike Hewson, thank you?

A.   Yes, sir.

Q.   Does that have any significance to you?

A.   Yes, sir.

Q.   What is that?

A.   In that the crank, one gram of crank cost $100.00.   I had given Mike $100.00 in five twenties and this part here relates that Rick had given him $10.00 for $90.00 for the crank after Mike paid a hundred dollars.

Q.   Referring to anything in making the statement saying thank you other than what we are talking about here?

A.   No, he would have been receiving the $10.00 back from Mike in my opinion.

. . .

Q.   They have transcribed as Rick Webb saying that is a good one, Vicki and how did the State transcribe that one?

A.   From Mike Hewson and a good one, Rick.

Q.   Okay.   Now, the jury will have to ultimately decide who is saying what.  What is your opinion as to what is being said?

A.   A good one, Rick.

Q.   By who?

7

A. By Mike Hewson.

Q. Would that have any significance?

A. Yes.

Q. And what would that be?

A. That would be that at this point, he has looked at his drugs or at the crank and the bindle and in my opinion he is saying that it is good.

Q. Is that consistent with what was going on or should have been going on?

A. Yes.

Q. Is that consistent with what Mike Hewson said went on?

A. Yes, sir.

. . .

Q. Now, first, there is a specific tone of voice that everybody uses in this conversation; is that correct?

A. Yes.

Q. You listened to the tape and everybody was using a voice intonation; is that right?

A. Yes, sir.

Q. You know what I am talking about?

A. I believe so.

Q. Voices go up and down and change depending on who they are responding to; is that right?

A. Yes.

Q. And these particular conversations especially about Woodsy was, had a very specific voice coloration; is that right?

A. Yes, sir.

The State does not maintain on appeal that Officer Gassett

8

testified as an expert witness in this matter, nor would his testimony qualify under Rule 702 of the Montana Rules of Evidence, since no scientific, technical or other specialized knowledge was necessary to assist the trier of fact in understanding the evidence. The State does argue, however, that Officer Gassett's testimony is admissible pursuant to Rule 701, M.R.Evid. The rule sets forth two guidelines to be met in order for opinion testimony to be given by lay witnesses:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Rule 701, M.R.Evid.

We find that the testimony of Officer Gassett regarding the significance of certain parts of the tape recording fails subsection (b) of Rule 701, M.R.Evid., in that his opinion testimony is not "helpful to a clear understanding of his testimony or the determination of a fact in issue." No language peculiar to drugs or drug deals was used in the tape-recorded conversation. The jury was capable of understanding the plain language of the conversation without the aid of Officer Gassett's opinion testimony. Where terms are capable of being understood by the layman, and where the jury is capable of interpreting the language or slang involved, lay witness opinion testimony is improper, as is the lay witness's conclusion or interpretation of the conversation. See, United States v. Marzano (7th Cir. 1976), 537

9

F.2d 257; DeLoach v. United States (D.C. Cir. 1962), 307 F.2d 653.

We reverse and remand.

_____
                                        Justice

We concur:

_____
                Chief Justice

_____

_____

_____
                Justices

10