Judge GIERKE
delivered the opinion of the Court.
Military Rule of Evidence 701 [hereinafter M.R.E.] limits opinion testimony by lay witnesses. This ease concerns whether M.R.E. 701 allows a lay witness to interpret what Appellant meant when he wrote certain passages in letters to the witness. We agree with the well-established federal civilian rule that this kind of lay opinion testimony is, with certain limited exceptions, impermissible. Although the military judge improperly allowed a lay witness to offer her opinion about Appellant’s meaning in various passages he wrote to her, we find the error to be harmless.

BACKGROUND

Appellant was tried by a general court-martial consisting of officer and enlisted members. Contrary to Appellant’s pleas, the members found him guilty of one specification of committing forcible sodomy with his daughter A.B. on divers occasions in violation of Article 125 of the Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 925 (2000). The members found him not guilty of seven other specifications alleging various acts of sexual misconduct with the same daughter. The members sentenced Appellant to a dishonorable discharge, confinement for ten months, reduction to the lowest enlisted grade, and forfeiture of all pay and allowances. The convening authority initially approved the sentence as adjudged.
The Army Court of Criminal Appeals set aside the original convening authority’s action in an unpublished opinion. The convening authority then again approved the sentence as adjudged, but retroactively waived forfeitures for a six-month period. The Army Court then affirmed the findings and sentence in an unpublished opinion and Appellant filed a timely petition for grant of review. We granted the petition to address the permissible scope of lay opinion testimony. See 59 M.J. 215 (C.A.A.F.2003). This issue does not involve, and we do not address, the distinct question of when a witness may testify about how another person’s communications affect the witness.

FACTS

Appellant was charged with sexual offenses involving his daughter A.B. when she was ten and eleven years old. While Appellant was confined by civilian authorities before trial, he wrote two letters to his wife, as well as another letter to their daughter A.B. The defense moved in limine to exclude those letters and Mrs. Byrd’s testimony about them.
The defense argued that any testimony about the letters’ content would be speculative and that the testimony’s prejudicial effect would outweigh its probative value. At a hearing on this motion, Mrs. Byrd testified that she recognized the handwriting on the letters as Appellant’s. She also testified that *6 she had known Appellant for about sixteen years and had been married to him for eight years. She then provided her interpretation of various phrases appearing in the letters. The trial counsel argued that the letters and Mrs. Byrd’s opinion testimony were admissible to show that Appellant was threatening his wife to impede his family’s cooperation with the prosecution. The trial counsel also noted that the Government intended to present expert testimony from a psychologist concerning how “statements can be used as threats designed to have a spouse not go forward with charges.”
In ruling on the motion to exclude Mrs. Byrd’s testimony about the letters, the military judge first noted that the letters themselves were admissible as “admissions by the accused.” The military judge then made a contingent ruling that Mrs. Byrd’s testimony would become relevant if the Government presented expert testimony concerning accused individuals’ use of psychological or financial pressure to convince their victims to recant.[1] The military judge specifically concluded that “Mrs. Byrd’s opinion as to what the accused was trying to say to her” would be helpful to the members.
Mrs. Byrd ultimately testified about the letters during the Government’s case in chief. The trial counsel directed Mrs. Byrd to read various passages from the letters, which had not yet been published to the members. After the members heard each passage, the trial counsel elicited additional information from Mrs. Byrd, including her opinion about what Appellant meant when he wrote some of the passages. The defense now challenges the admissibility of her responses concerning eight specific passages.

DISCUSSION

M.R.E. 701 establishes a two-part test for admissibility of lay opinion: (1) the opinion must be rationally based on the witness’s perception; and (2) the opinion must be helpful to the determination of a fact in issue. Like other evidentiary rulings, a military judge’s application of M.R.E. 701 is reviewed for an abuse of discretion. See United States v. Littlewood, 53 M.J. 349, 353 (C.A.A.F.2000). A trial judge’s ruling is “entitled to ‘due deference.’ ” United States v. Maxwell, 38 M.J. 148, 152 (C.M.A.1993) (quoting United States v. Strozier, 31 M.J. 283, 288 (C.M.A.1990)). Accordingly, we will reverse for an abuse of discretion only “if the military judge’s findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law.” United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F.1995). In this case, we find such an abuse of discretion.
Application of the lay witness opinion rule, M.R.E. 701, to interpretations of the meaning of another person’s communications is an issue of first impression in military law. Accordingly, we will seek guidance from judicial interpretations of Federal Rule of Evidence 701, the model for its military counterpart.[2] See Manual for Courts-Martial, United States (2002 ed.), Analysis of the Military Rules of Evidence A22-49 (“Rule 701 is taken from the Federal Rule without change.”); see also id. at A22-2, Analysis of M.R.E. 101 (“While specific decisions of the Article III courts involving rules which are common both to the Military Rules and the Federal Rules should be considered very persuasive, they are not binding.”).
*7 The general rule in federal civilian courts is that “[l]ay witnesses are normally not permitted to testify about them subjective interpretations or conclusions as to what has been said.” United States v. Cox, 633 F.2d 871, 875 (9th Cir.1980); see also United States v. Green, 44 M.J. 631, 639 n. 3 (C.G.Ct.Crim. App.1996) (O’Hara, J., concurring). Such lay interpretations are admissible “only if rationally based on perception of a witness and helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue.” Cox, 633 F.2d at 875.[3] For example, a lay witness may be permitted to interpret “coded or ‘code-like’ conversations.” United States v. Dicker, 853 F.2d 1103, 1108 (3d Cir.1988).
The Second Circuit has emphasized the foundational requirements that the proponent must satisfy before a witness’s interpretation of another person’s meaning becomes admissible. “In order to allow lay opinion testimony interpreting a facially coherent conversation ..., the government would have to establish a foundation that called into question the apparent coherence of the conversation so that it no longer seemed clear, coherent, or legitimate.” United States v. Garcia, 291 F.3d 127, 142 (2d Cir.2002).
We agree with the general prohibition of lay opinion testimony interpreting facially coherent communications. “Where terms are capable of being understood by the layman, and where the jury is capable of interpreting the language or slang involved, lay witness opinion testimony is improper, as is the lay witness’s conclusion or interpretation of the conversation.” State v. Webb, 243 Mont. 368, 792 P.2d 1097, 1100 (1990).
For a lay opinion interpreting another person’s meaning to be admissible, the proponent must establish that the witness has some special basis for determining the speaker’s true meaning. See generally David A. Schlueter, et al., Military Evidentiary Foundations 272-73 (2d ed.2000). Once that foundation is laid, the witness “may clarify conversations that are abbreviated, composed of unfinished sentences and punctuated with ambiguous references to events that were clear only to the conversation participants,” United States v. Sneed, 34 F.3d 1570, 1581 (10th Cir.1994), or which include code or code-like language. Dicker, 853 F.2d at 1108. When such permissible testimony is presented, the “accuracy of those perceptions is a question for the [members].” Sneed, 34 F.3d at 1581.
These general rules can be applied to sort Mrs. Byrd’s testimony concerning her husband’s letters into three categories:
(1) Mrs. Byrd’s opinions concerning Appellant’s meaning in several passages that were facially coherent were inadmissible.
(2) Mrs. Byrd’s opinions concerning Appellant’s meaning when he wrote certain ambiguous statements were also inadmissible because they were unaccompanied by any particularized demonstration that she had a basis for determining Appellant’s true meaning. It was not enough to show that Mrs. Byrd was familiar with Appellant’s handwriting and had corresponded with him in the past. As the proponent of this testimony, the Government was required to demonstrate that Mrs. Byrd had some basis for knowing *8 Appellant’s intended meaning for the particular phrases that she purported to interpret.
(3) Mrs. Byrd’s testimony providing background information concerning references in the letters to other events was admissible.
We will now address Mrs. Byrd’s testimony concerning each of the eight passages.

Passage One

Appellant’s first challenge is to Mrs. Byrd’s testimony interpreting a portion of Appellant’s letter of June 24, 1999, that stated, “Well, I will. I won’t strike until you tell me your intentions. My thinking is, you care for me and want to help me get out of this. That’s what I think. I’ll wait till [sic] you decide the other.”
During her testimony on the merits, Mrs. Byrd explained, “I had always been afraid that he would get mad and take the money out of the bank and then I wouldn’t have any money to pay the bills and take care of the kids.” She then provided this interpretation of the passage:
I took it that if I didn’t—that if I didn’t tell—when he found out which way I was going to tell—say it did happen or say it didn’t happen, he was going to wait and then based upon that was what he was going to do, based upon whichever way that I went. And that because of how I felt about him, that I would keep on doing what I had been doing, trying to protect him.
The trial counsel then asked, ‘When you say it did happen or didn’t happen, what are you talking about?” Mrs. Byrd answered, “I’m talking about the sexual abuse. If we kept saying that it did not happen and if I kept not cooperating.” The trial counsel followed up by asking, “Then if you kept on doing that, what would he do?” Mrs. Byrd answered, “If I kept on not cooperating with the authorities, then things would continue on as the same that he would give me financial support.”
Appellant’s meaning in this passage is unclear. Mrs. Byrd interpreted it as a promise of continued financial support in return for not cooperating with the prosecution. That interpretation is not clear from the communication itself. Accordingly, Mrs. Byrd’s interpretation of Appellant’s meaning was admissible only if supported by an evidentiary foundation to establish that Mrs. Byrd had some means, such as prior usage, to determine Appellant’s intent when he wrote these words. However, during the motions hearing, the Government did not lay any foundation to demonstrate that words or phrases used in this passage had some established meaning in the couple’s communications. Thus, when the military judge ruled on the motion, he erred when he held that this testimony was admissible. Nor did the Government lay the missing foundation later when Mrs. Byrd testified during the Government’s case-in-chief and in rebuttal. Mrs. Byrd’s testimony concerning the first passage therefore fell into the second category discussed above and was inadmissible.

Passage Two

Also in his June 24 letter, Appellant wrote, “Even if I did go away for the rest of my life, I’ll be unable to help financially in prison, but I’ll help mentally.” The trial counsel asked Mrs. Byrd, “What did you think he meant when he said, ‘go away for the rest of my life?’ ” Mi's. Byrd answered, “That he thought he would go to jail. He would go to prison.” The trial counsel then asked, “Why would he go to jail?” She responded, “If he was found guilty of the charges of abuse.”
The meaning of this passage is plain on its face. Thus, testimony about this passage fell into the first category discussed above and was inadmissible. Mrs. Byrd’s interpretation was particularly problematic because it subtly changed the passage’s meaning. While Appellant’s sentence was conditional—“if I did go away”—she testified that he thought he would go to jail.

Passage Three

The final passage at issue from the June 24 letter read, “Tell the kids I love them very much. I’m going to do time, no doubt.” Mrs. Byrd interpreted this passage to mean “[t]hat he thought he was going to go to *9 prison.” Like the previous passage, Appellant’s meaning is plain, and the military-judge erred by allowing Mrs. Byrd to “interpret” it.

Passage Four

The first passage at issue from Appellant’s June 26 letter to his wife stated, “If [A.B.] would only write to me that she’s going to stick by me and in court say it didn’t happen.” Mrs. Byrd interpreted this passage to mean that “he wants her not [sic] to say that it didn’t happen.” Again, the passage’s meaning is plain on its face, and the military judge erred by allowing Mrs. Byrd to offer her opinion concerning its meaning.

Passage Five

Appellant also wrote in his June 26 letter: The main reason I told you what I did in the [ear] before I left was to gain trust and answer your questions. I also did it because I know if I tell you the deal, there is a chance for our relationship. I mean, you did say so before, so I’m going to keep that in mind.
The trial counsel asked Mrs. Byrd to explain the reference to the conversation in the car. She answered:
It was a conversation that took place when we were in the car and I was taking him to Fort Campbell. And we were talking and he said I could ask him anything I wanted and he would tell it to me truthfully. And I asked him did him [sic] and [A.B.] have sex again____ And he told me yes, they had. And the reason that it had happened was because [A.B.] wanted him to and that she was going to tell me that it happened anyway. And so he went ahead and did it.
During Mrs. Byrd’s explanation of passage five, the trial counsel also asked, “[W]hen he says, T mean you did say so before, so I’m going to keep that in mind,’ what is he talking about there?” Mrs. Byrd answered, “I had told him that if he told me the truth, that—before, when I had found out, that I wouldn’t leave him, that we you know, we could go to get some counseling and we could work through this.” The trial counsel then clarified that Mrs. Byrd was referring to her actions after A.B. first revealed Appellant’s abuse of her.
Mrs. Byrd’s testimony concerning this passage was a permissible explanation of an “ambiguous referencef] to events that were clear only to the” letter’s author and recipient. Sneed, 34 F.3d at 1581. The Government’s presentation of her testimony concerning Appellant’s remarks during a previous conversation was also independently permissible as an account of admissions by a party opponent. See M.R.E. 801(d)(2).

Passage Six

In his June 26 letter to his wife, Appellant also wrote, “God, I love my children. I want to be a part of their life so bad. How can I ..., making $15.00 a month the rest of my life.” Mrs. Byrd interpreted this passage to mean “[t]hat if he goes to prison, he’s only going to be making $15.00, I guess a day or whatever. And he wouldn’t be able to help us. He wouldn’t be able to take care of the family.”
The meaning of passage six appears to be clear. Thus, it fell into the first category discussed above, and allowing testimony to interpret it was error. To the extent that this passage is ambiguous, that ambiguity does not appear to implicate any special knowledge of its intended reader. Neither during the motions hearing nor during Mrs. Byrd’s testimony before the members did the Government lay a foundation to establish that Mrs. Byrd had any unique ability to interpret this particular passage. Her testimony was simply conjecture. Thus, even if the interpretation of this passage did not fall into the first category discussed above, it fell into the second. In either case, Mrs. Byrd’s interpretation of passage six constituted impermissible lay opinion testimony.
Passage Seven
Appellant’s June 26 letter also stated, “I’d do anything for our marriage, even counseling or pretty much anything you or [A.B.] want[ ]. Not guilty will stay in effect. Everything else, I’ll do for the family and their wishes.”
*10 The trial counsel asked Mrs. Byrd, “When he says he’ll do anything for the marriage, what is he talking about?” She answered, “I had told him that I wanted us to get counseling.” The trial counsel then asked, ‘When did you tell him that?” She replied, “I had been telling him the whole time this was going on. I had told him that we needed to get counseling.” Mrs. Byrd explained that Appellant “said that we couldn’t get counseling. The only counseling we need was each other, because if we told—if we went somewhere and told them what was going on then they would have to act on what we told them.” She also testified that she meant both marriage counseling and counseling concerning the abuse.
Mrs. Byrd’s testimony concerning this passage was permissible for the same reasons discussed in connection with passage five, above. The Government was permitted to elicit Mrs. Byrd’s explanation of ambiguous references that were clear only to the letter’s author and recipient, and the testimony concerning Appellant’s remarks in earlier conversations was admissible as an account of admissions by a party opponent.

Passage Eight

The final passage at issue from Appellant’s June 26 letter stated, “They’ll see me of course. I’ll be in prison then, but they know I love them.” The trial counsel asked Mrs. Byrd, “[W]hy would he be in prison?” She replied, “If he got—if he got found guilty of the charges of the sexual abuse.”
The meaning of passage eight is plain on its face. Mrs. Byrd’s testimony concerning the passage, therefore, fell into the first category discussed above and was inadmissible.

Summary

We hold that the military judge properly allowed Mrs. Byrd to provide background information concerning passages five and seven. However, we hold that the military judge erred by allowing the Government to present her lay opinions concerning Appellant’s meaning when he wrote the remaining six passages.

Prejudice Analysis

Having found that the military judge erroneously allowed Mrs. Byrd’s testimony concerning six of the passages, we will test for prejudice. “We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the Government’s case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.” United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F.1999). The burden of demonstrating harmlessness rests with the Government. United States v. Baumann, 54 M.J. 100, 105 (C.A.A.F.2000). In this case, the Government easily carries this burden.
This was a hard-fought case, involving extensive evidence presented by both the Government and the defense. The Government’s case included the testimony of A.B. herself concerning her father’s sexual offenses. A.B.’s younger brother testified that he saw Appellant and A.B. in the shower together naked. A.B.’s younger sister testified that she once looked through a crack in their home’s master bedroom door and saw Appellant kissing A.B. Appellant’s wife testified that Appellant twice admitted to her that he did sexually abuse A.B.
The defense case included Appellant’s explicit denial of the offenses, extensive good military character evidence, a limited alibi defense, and evidence about A.B.’s recantation of her allegations in the midst of child custody hearings.
While the contentious nature of the case militates in favor of finding prejudice, other aspects of this case convince us that the error was harmless. Mrs. Byrd’s inadmissible testimony concerning the six passages was of limited materiality. Other aspects of her testimony concerning Appellant’s admissions and a request from Appellant to destroy evidence were, if believed, far more damaging to the defense.
Nor was Mrs. Byrd’s testimony about the letters a focal point of the case. For example, during his closing argument to the members, the trial counsel emphasized not Mrs. Byrd’s interpretation of the letters, but rath *11 er the language of the letters themselves and Appellant’s testimony about the letters. In the larger context of the Government’s case, Mrs. Byrd’s impermissible opinions concerning six passages in Appellant’s letters were insignificant. To the extent that the letters influenced the findings, it was Appellant’s own words rather than Mrs. Byrd’s interpretations of those words that hurt the defense. Thus, Appellant was not prejudiced by the military judge’s erroneous rulings.
CONCLUSION
The decision of the United States Army Court of Criminal Appeals is affirmed.

. The Government satisfied this condition by presenting the testimony of a civilian psychiatrist from Fort Campbell, though curiously the Government called him as a witness after Mrs. Byrd had already testified.

. This case was tried before the 2000 amendment to Federal Rule of Evidence 701, which prohibited lay opinion testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702.” See Amendments to Federal Rules of Evidence, 529 U.S. 1189, 1194-95 (2000). While the 2002 edition of the Manual for Courts-Martial does not reflect the change, the 2000 amendment to Federal Rule of Evidence 701 now applies in courts-martial through operation of M.R.E. 1102. A proposed amendment to the Manual for Courts-Martial specifically incorporates the change to Rule 701. See Notice of Proposed Amendments to the Manual for Courts-Martial, United States, (2000 ed.) and Notice of Public Meeting, 66 Fed.Reg. 30,431 (proposed June 6, 2001). Other proposed amendments incorporate changes to M.R.E.s 103(a)(2), 404(a), 701-702, and 803(6) that have already taken effect through operation of M.R.E. 1102.

. The First, Third, Fifth, Seventh, and D.C. Circuits follow rules similar to the Ninth Circuit’s formulation in Cox. See, e.g., United States v. Saccoccia, 58 F.3d 754 (1st Cir.1995); United States v. Dicker, 853 F.2d 1103, 1108-09 (3d Cir.1988); United States v. White, 569 F.2d 263, 267 (5th Cir.1978); United States v. Marzano, 537 F.2d 257, 268 (7th Cir.1976); DeLoach v. United States, 307 F.2d 653, 655 (D.C.Cir.1962) (pre-Federal Rules of Evidence case); see also United States v. Coleman, 284 F.3d 892, 894 (8th Cir.2002) (upholding police officer's testimony interpreting defendant’s "drug jargon”); United States v. Peoples, 250 F.3d 630, 640-42 (8th Cir.2001) (holding that FBI agent's interpretations of codefendants’ conversations were inadmissible under Fed.R.Evid. 701). The Sixth Circuit, however, maintains that a witness may "testify in the form of an opinion as to his understanding of a defendant's statement.” United States v. Graham, 856 F.2d 756, 759 (6th Cir.1988); accord United States v. Elder, 90 F.3d 1110, 1114 (6th Cir.1996). See also United States v. Awan, 966 F.2d 1415, 1430 (11th Cir.1992) (interpreting Fed.R.Evid. 701 to allow a witness to clarify conversations that are abbreviated, composed of unfinished sentences, or containing ambiguous references to events that were clear only to the communication's participants).