# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
POND, MORRIS, and JUETTEN
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Chief Warrant Officer Two JONATHAN K. CUNNINGHAM**
**United States Army, Appellant**

ARMY 20220140

Headquarters, Fort Bragg
Gregory B. Batdorff and John H. Cook, Military Judges
Colonel Joseph B. Mackey, Staff Judge Advocate

For Appellant: Captain Robert W. Duffie, JA (argued);[1] Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Robert W. Rodriguez, JA; Captain Robert W. Duffie, JA (on brief); Lieutenant Colonel Autumn R. Porter, JA; Major Robert W. Rodriguez, JA; Captain Robert W. Duffie, JA (on reply brief).

For Appellee: Captain Alex J. Berkun, JA (argued); Colonel Richard E. Gorini, JA; Major Marc B. Sawyer, JA; Major Austin L. Fenwick, JA (on brief).

4 November 2025

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

POND, Senior Judge:

An officer panel sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of false official statement, one specification of sexual abuse of a child by intentionally communicating indecent language to a child under 16 years of age, and one specification of wrongful

---
[1] We heard oral argument in this case on 31 March 2025 as part of "Project Outreach," a public awareness program demonstrating the operation of the military justice system.

interference with an adverse administrative proceeding in violation of Articles 107, 120b, and 131g, Uniform Code of Military Justice, 10 U.S.C. §§ 907, 920b, 931g [UCMJ]. Prior to findings, the military judge dismissed one specification of indecent language in violation of Article 134, UCMJ, on preemption grounds. For the offenses of which appellant was convicted, the military judge sentenced him to be dismissed from the service.

The charges arose from Instagram messages sent to the victim, a 13-year-old girl, and the ensuing investigation. Before this court, appellant alleges his convictions are factually insufficient because the government could not prove beyond a reasonable doubt that he committed the Article 120b, UCMJ offense when his 14-year-old son, and not appellant, sent the messages communicating indecent language to the victim. Appellant also argues the government failed to prove the charged indecent language—"helicopter sit and spin midget" and "you're such a tease"—was both indecent and communicated with an intent to arouse the sexual desire of appellant, as charged. Separately, appellant argues the military judge erred by admitting an out of court statement from appellant's wife as an excited utterance. Appellant requests this court grant relief by setting aside the findings and sentence.[2] For the reasons discussed below, we disagree and find the evidence factually sufficient and the hearsay statement properly admitted and affirm.

## BACKGROUND

Appellant and the victim's father, Staff Sergeant (SSG) ▮, met when they were both enlisted Soldiers, eight years before the events related to the offenses unfolded. Appellant became a mentor and friend to SSG ▮, who had children of a similar age to appellant's children, and their families stayed close throughout various assignments to different duty stations over the years. The victim was the 13-year-old daughter of SSG ▮ from a prior relationship, who primarily resided with her mother in another state. The victim had never met appellant in the eight years leading up to the offenses. In the summer of 2019, however, she visited her father in North Carolina, where appellant was also stationed, and for the first time met appellant and his family. Appellant became like an uncle figure to the victim. They talked about his work, his back injury, and sharks. On the other hand, the victim barely talked to appellant's son who

---

[2] We address a third assignment of error regarding improper opinion testimony further in the opinion. We have given full and fair consideration to appellant's other assignments of error as well as those matters personally raised pursuant to *Untied States v. Grosfeton*, 12 M.J. 431 (C.M.A. 1982), and find they merit neither discussion nor relief.

was only a year or two older than her and good friends with her older brother. Appellant brought the victim a hooded sweatshirt with the word "SAVAGE" on the front. In mid-February of 2020, she thanked appellant for the sweatshirt in a text message through the social media platform, Instagram. A short exchange ensued where the two discussed the victim's recent trip to an aquarium and ended with appellant telling the victim not to skip school and wishing her safe travels home.

Four months passed with no messages exchanged between the two Instagram accounts. Then, on 29 June 2020, shortly after noon, the victim received a message from appellant asking, "How's life in Washington going?" Another conversation ensued, this one longer than the previous exchange. Appellant at first asked when the victim was going to come back to visit her father (she was planning on visiting her father the following month) and then appellant joked about the victim's short height (she was only five feet tall) and appellant's back injury and greater height (appellant was reportedly six feet tall). When the victim expressed that she wished she was taller, appellant replied: "Nah short is good . . . I'll explain when you're older."

The messages from appellant also commented on a picture the victim posted on her Instagram account, which she took of herself posing in a bathroom:

> JC:[3]  Trying to look all cute in the pics you took
>
> . . .
>
> JC:    In the tie dye with your tongue out lol
>
> . . .
>
> JC:    I was gonna say something about your pic but I won't

Appellant also commented on how the victim's shorts made it look like she was not wearing pants in the picture: "I see skin . . . I see side leg . . . [the shorts] must be really short."

---

[3] We use "JC" to refer to messages from appellant's Instagram account, "Victim" to refer to messages from the victim's social media accounts, and "Jonathan" to refer to messages from appellant's Snapchat account, described *infra*.

The messages then turned to the victim's age and how she was almost 14 years old—"Hmmmm 14, and short . . . Well I'm old, I should stop texting you"—before appellant again teased the victim about her height, calling her "midget" and "Frodo." The victim testified at trial that she did not know what Frodo meant.

When the victim called appellant "skyscraper" because of his height, appellant responded he had "worse" nicknames for the victim "but your ears are too young . . . Plus you might snitch." The two discussed meeting up so the victim could "slit [appellant's] eyebrow," but because the victim's stepmother would have her "on lockdown," their meeting "would have to be on the DL." The victim testified that "DL" was an abbreviation for "down low," which meant "kind of secretive."

When the victim continued calling appellant "skyscraper," the following exchange ensued:

> JC:         I'm going to find a really bad nickname for you
>
> Victim:     hahah bring it on
>
> JC:         I'll start calling you Sit and Spin

At trial, witnesses familiar with the term testified that "spit and spin" referred to a sexual position where a female, typically petite, sits on the male genitalia and spins around the male's penis 360 degrees.

The messages continued to joke about appellant's age. The victim called appellant "ancient." In response, appellant called the victim, "Savage." Appellant then inquired about the victim's boyfriends and whether she had "messed around" and had "bodies." The victim testified that "bodies" referred to the number "of people you've slept with."

> Victim:     nah ion wanna do that w the guys here but
>             i've gotten close let's jus say that
>
> JC:         So you are still somewhat innocent
>
> Victim:     yeah hahah
>
>     . . .

4

JC:  So you knew what sit and spin was lmao

Victim: yeah hahah who tf doesn't

At trial, the victim testified she did not, in fact, know what "sit and spin" meant but said she did because she did not want to seem less intelligent.

JC:  lol I don't know

. . .

JC:  Ummm I don't know how to react now

. . .

   I'm scared to talk to you now lmao

Victim: you should be

   HAHA IM JP

JC:  Wow

Victim: hahahah

JC:  And you wanna razor my eyebrow???

. . .

JC:  You are just looking for an excuse to get close to me

. . .

JC:  Cause I know I ain't ugly

Victim: mhm keep telling yourself that

JC:  You pant less midget

Victim: fuck off (laughing emoji)

JC:  Nah

> Helicopter sit and spin midget

The conversation again turned to the victim's boyfriends and the "level" of seriousness:

| | |
|---|---|
| JC: | So how many ex's you talking about? |
| | Told you now I'm curious |

Appellant also asked how old the victim's boyfriends were:

| | |
|---|---|
| JC: | How old??? |
| . . . | |
| JC: | When you said older I thought you meant like in their 20s or something |
| . . . | |
| Victim: | a couple guys on my snap are like 19 but 22 is the oldest |
| JC: | You're trouble!!! |
| | I didn't know you had snap lol |
| | I have one but no one really knows I have it |

Appellant joked that he should make an OnlyFans page and get paid. OnlyFans is a site where users can post explicit or sexual pictures of themselves to which others can subscribe and pay. Appellant then asked for the victim's Snapchat username so he could add her. Snapchat is another messaging platform where messages will automatically delete after a certain period of time, if not immediately, upon being viewed. The victim's Snapchat account was private, requiring her to add appellant to communicate with him. After the victim told appellant she received "at least two dick pics a week," appellant responded "No dick picks I promise lol." The conversation then moved to Snapchat where they continued to talk about how the victim should make an OnlyFans page but with "normal pictures and still get paid." Appellant called the victim a tease.

While Snapchat automatically deletes messages, the victim was able to surreptitiously take screenshots of some of the last messages exchanged. The victim testified Snapchat would typically send a notification to the other person if a screenshot of a message were taken, but she discovered if she exited the application while still having it displayed in the background of her cell phone, she could take a screenshot without Snapchat sending the notification. The victim stated she did not screenshot every text although there were about twenty messages, including one in which she told appellant he was being scary and one in which she pointed out the age difference between them:

> Jonathan: Oh so now I'm a creeper??? (sad face emoji)
>
> Victim: I mean ur 39 on a 13 year olds snap sooooo

A few hours after this exchange, the victim noticed she had been unadded from appellant's Snapchat account.

The victim questioned whether the conversation was normal—"is this how uncles are supposed to talk?"—but hesitated telling her dad because she did not want to overreact or ruin his friendship with appellant. Three weeks later, however, while visiting her dad in North Carolina, the victim showed her father the messages.

Upon reading the messages, SSG ▮ immediately drove to appellant's house in the middle of the night and confronted him. When SSG ▮ asked appellant if he was having an inappropriate conversation with his daughter, appellant threw up his arms, shrugged his shoulders, looked out at the street, and said "nope." SSG ▮ thought it was weird that appellant would not look at him and asked the question again and got the same response. When SSG ▮ told appellant he had proof on his daughter's phone, appellant again denied sending the messages to the victim. SSG ▮ then went back to his house to retrieve his daughter's cell phone. When he returned a few minutes later, appellant's wife walked out, grabbed the phone, and said "What the f**k is this, Jonathan?" Appellant replied that he did not know and that it looked like his account "but doesn't sound like me." Appellant's wife began looking through the messages and before she handed the phone back to SSG ▮, she said, "I told you to stop talking to her." The defense objected to the admission of this statement at trial, which serves as the basis for appellant's second assignment of error discussed further below. Before he left, SSG ▮ asked appellant one more time if appellant did it and he got the same response—a denial while appellant looked out at the street. SSG ▮ testified that appellant did not look him in the eye at any point while talking to him that night.

7

The next morning, appellant texted SSG ▮ to call him because appellant's son had confessed to sending the messages to the victim using appellant's Instagram password. Appellant's wife took screenshots of text messages between her and her son in which he admitted to texting the victim, and sent the screenshots to the victim's stepmother. The screenshots reflected the following exchange between appellant's son and appellants wife:

Son: does what happened with [SSG ▮ have something to do with [the victim]?

Wife: Why would you think that?

Son: because a month or couple ago i texted her

Wife: About what?

Son: just about stuff
and some stuff i shouldn't have

Wife: Elaborate

Son: i was on dads instagram because i was bored and
i saw he had a message from her
and i responded pretending to be him

In the texts, appellant's son denied that appellant told him to say it was him. When the victim's stepmother received the screenshots of the text messages from appellant's son, she immediately asked to talk with him through Facetime video chat. During this conversation, the victim's stepmother asked appellant's son in different ways if he had ever chatted with the victim on Snapchat. He told her he had not. After this conversation, appellant's son wrote an apology letter in which he also confessed to sending the victim messages from appellant's Snapchat account.

SSG ▮ first reported the matter to U.S. Army Criminal Investigation Division (CID), but appellant's command initiated an administrative investigation under Army Regulation 15-6, Procedures for Administrative Investigations and Boards of Officers (1 April 2016) [AR 15-6]. On 22 October 2020, the AR 15-6 investigating officer (IO) interviewed appellant, who gave a statement. The IO also asked appellant if he would give consent to the IO to interview his son alone, without a parent present. Appellant declined and was present during his son's interview. During the IO's questioning of his son, appellant asked a few times why the IO was asking a question but otherwise just stared at his son while he answered questions. His son, on the other hand, never

looked at appellant, but appeared tense, nervous, and fidgety as he explained that he used appellant's passcode and login information to twice hack into appellant's social media account.[4] Appellant's son typed his responses to the interview questions in a sworn statement as appellant looked over his shoulder. As the IO left the room to print the sworn statement, he overhead appellant telling his son that one of his answers was wrong. When the IO returned, appellant's son said he needed to change one of his answers. His original statement stated, "I first went into his accounts around the beginning of the summer, probably around June to August." He then crossed out "June" and wrote "January."

The government subsequently charged appellant with sexual abuse of a child by intentionally communicating indecent language—"helicopter sit and spin midget" and "you're such a tease"—to the victim, a child under the age of 16 years old. Additionally, the government charged appellant with communicating a false official statement for later telling CID he did not text the victim[5] and wrongful interference with an adverse administrative investigation for telling his son to change his sworn statement. Appellant was convicted of all three of these offenses. The government also charged appellant with indecent language in violation of Article 134, UCMJ, which the military judge dismissed on preemption grounds after the presentation of evidence but before findings.

At trial, the government's case in chief included testimony from the victim about the messages from appellant's accounts on Instagram and Snapchat. The victim also testified that appellant was six feet tall while his son was only an inch or two taller than her 5-foot frame. The government introduced the messages sent from appellant's Instagram account to the victim in February 2020 and June 2020, as well as the screenshots the victim took of messages from appellant's Snapchat account. Additionally, the government introduced text messages from appellant to SSG ▮ and text messages from appellant's son to demonstrate the difference in style, punctuation, and capitalization; specifically, the lack of punctuation and capitalization in the messages written by appellant's

---

[4] The IO testified that during their verbal conversation, before typing the sworn statement, appellant's son stated he used appellant's cell phone to access appellant's social media accounts. Appellant's son, however, testified that he used his own cell phone to message the victim through appellant's social media accounts.

[5] At trial, the parties stipulated that this referred to text messages sent to the victim on 29 June 2020.

son. The government also introduced the sworn statements from appellant and appellant's son to the command's appointed investigating officer as well as CID's subsequent interview of appellant. During the CID interview, appellant denied messaging the victim on 29 June 2020, stating the first time he found out about the messages was the night SSG BJ came to his house to confront him. Appellant subsequently deleted all of his social media accounts, including Instagram and Snapchat. He further stated multiple times throughout the interview that he had only previously messaged the victim to ask, "How's life?".

Appellant's son took the stand and testified that he was the one who sent the victim the messages on 29 June 2020. His son testified that he knew appellant's passwords, which he used to log in to appellant's Instagram account using his own cell phone and that he messaged the victim on impulse after seeing the picture she posted on Instagram. He thought she was cute. Appellant's son testified he was familiar with the things they discussed about appellant—his father's age and injuries—and had no problem impersonating his father, to include imitating his style of text messaging. While the son's cell phone settings were adjusted to not automatically capitalize text, he testified he manually capitalized the beginning of every message to the victim in order to impersonate appellant. He also testified he had heard "helicopter sit and spin" at school and was familiar with the character Frodo from Lord of the Rings. As punishment for his actions, the son had all of his electronics taken away for a month. On cross, appellant's son was unable to identify one of the pictures the victim included as part of the Instagram post from 27 June 2020, a post that appellant's son had previously testified he saw on the Instagram feed and that, according to his testimony, prompted him to spontaneously message the victim. He also testified that he loved his father, trusted him, and did not want to see him get in trouble. In addition to appellant's son, the defense called appellant's wife and six other witnesses who testified to appellant's character for honesty. At the time of trial, appellant had completed over 18 years of service.

## LAW AND DISCUSSION

### A. Hearsay

### 1. Additional Background

At trial, appellant objected to the admission of his wife's hearsay statement, "I told you to stop talking to her." The government argued the out of court statement was admissible as an excited utterance under the exception to the rule against hearsay in Military Rule of Evidence (M.R.E.) 803(2).

To litigate the matter, the military judge held an Article 39(a) session. SSG ██ testified when he arrived at appellant's home to confront appellant a second time, appellant's wife looked and sounded angry and upset while she looked through the messages. On cross, he admitted he did not know how many of the messages appellant's wife read before handing back the phone. He testified there was a break in between her initial statement, "What the f\*\*k is this?" and "I told you to stop talking to her," but in total he was only at appellant's home for about six minutes during this second confrontation.

The military judge ruled the statement was admissible as an excited utterance and was not otherwise excluded under M.R.E. 403's balancing test.[6] He found the statement was relevant to facts in issue, specifically, "at a minimum," the terminal element of the charged Article 134 offense. After the government rested, the defense moved to dismiss the Article 134 offense under preemption. Receiving no government objection, the military judge granted the motion and instructed the panel to disregard the dismissed charge and its specification.

### 2. Law and Discussion

"The standard of review of a military judge's ruling admitting or excluding an excited utterance is an abuse of discretion." *United States v. Feltham*, 58 M.J. 470, 474 (C.A.A.F. 2003). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003). If the error is nonconstitutional in nature, this court will find prejudice if the error had a substantial influence on the findings. *United States v. Bowen*, 76 M.J. 83 (C.A.A.F. 2017) (citation omitted).

"As a general rule, hearsay, defined as an out of court statement offered into evidence to prove the truth of the matter asserted, is not admissible in courts-martial." *United States v. Ayala*, 81 M.J. 25, 28 (C.A.A.F. 2021). As an exception, a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is admissible under M.R.E. 803(2). "The implicit premise [of the exception] is that a person who reacts 'to a startling event or condition' while 'under the stress of excitement caused' thereby will speak truthfully because of a lack of

---

[6] Mil. R. Evid. 403 provides: "The military judge may exclude relevant evidence if is probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence."

opportunity to fabricate." *Bowen*, 76 M.J. at 87-88 (quoting *United States v. Jones*, 30 M.J. 127, 129 (C.M.A. 1990) (internal quotations omitted).

For hearsay to be admitted as an excited utterance, our superior court adopted a three-pronged test:

> (1) the statement must be "spontaneous, excited or impulsive rather than the product of reflection and deliberation";
>
> (2) the event prompting the utterance must be "startling"; and
>
> (3) the declarant must be "under the stress of excitement caused by the event."

*United States v. Arnold*, 25 M.J. 129, 132 (C.M.A. 1987) (citations omitted) (internal quotation marks omitted).

"The proponent of the excited utterance has the burden to show by a preponderance of the evidence that each element is met." *United States v. Henry*, 81 M.J. 91, 96 (C.A.A.F. 2021). "Although hearsay may fall under an exception, like all evidence, it is subject to the balancing test of Mil. R. Evid. 403." *United States v. Guyton*, 2020 CCA LEXIS 462, at *20 (Army Ct. Crim. App. 16 Dec. 2020).

We find no abuse of discretion in admitting the hearsay statement from appellant's wife as an excited utterance under M.R.E. 803(2). We agree with the military judge that the event of being confronted with messages between her husband and the 13-year-old victim was a startling event. While SSG BJ testified that he did not know how many of the messages appellant's wife read, he observed her look through them and afterwards appear angry and upset when she made the statement. We also agree that appellant's wife was still under the stress of excitement caused by the event and her response was not the product of reflection or deliberation, but was spontaneous and impulsive. It was made within moments of seeing the messages, with little opportunity to calculate a response, and was not the product of questioning. As all three prongs of the *Arnold* test were met, the hearsay statement was admissible as an excited utterance.

Appellant further argues because the military judge found the hearsay statement was relevant to the Article 134 offense which was subsequently dismissed after the presentation of evidence but before findings, the military judge should have instructed the panel members to disregard the hearsay

statement. The military judge found the statement was relevant "at a minimum" to the terminal element of the Article 134 Indecent Language offense, however, he did not limit the admission of the hearsay statement to the single Article 134 offense. The government argued the hearsay statement was relevant not only to prove the later-dismissed Article 134 offense but also to show appellant was in fact the one texting the victim. We also find the hearsay statement was relevant on that fact at issue.[7] The statement from appellant's wife, "I told you to stop texting her," tended to make a fact of consequence—that it was appellant messaging the victim and not his son—more probable. Finally, we agree with the military judge's conclusion that the probative value of the statement was not substantially outweighed by the danger of unfair prejudice under M.R.E. 403. The probative value was relatively high when the identity of the person messaging the victim was a central issue in the case. And the evidence was not cumulative, it was not likely to "confuse the issues," or mislead the members.

Even assuming it was error to admit the hearsay statement, we find no prejudice. Because the declarant of the hearsay statement testified, thereby satisfying appellant's right to confrontation and due process, we apply the test for nonconstitutional evidentiary errors. *Compare United States v. Clayton*, 67 M.J. 283, 288 (C.A.A.F. 2009) (applying constitutional error test to testimonial hearsay). Weighing the strength of the government's case, the strength of the defense's case and the quality and materiality of the evidence, we conclude the evidence did not have "a *substantial* influence on the findings." *United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019) (citation and internal quotation marks omitted) (emphasis added). The evidence was material as it tended to prove that it was appellant who sent the messages but in light of the government's case, as discussed further below, we are not persuaded the admission of the hearsay statement had a substantial influence on the findings. The government's case was strong, even considering appellant's alibi, and were we to exclude this evidence, we would still find the evidence factually sufficient.

*B. Factual Sufficiency*

*1. Law*

We review factual sufficiency under Article 66, UCMJ. Because appellant's offenses occurred prior to 1 January 2021, we review under the previous version of Article 66, UCMJ. *See Manual for Courts-Martial, United*

---

[7] M.R.E. 401: "Evidence is relevant if: (a) it has *any tendency* to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." 2019 MCM, pt III-18 (emphasis added).

*States* (2016 ed) *[MCM]*.[8] Under that statute, the "test for factual sufficiency is whether, after weighing the evidence in the record of trial and allowing for the fact that we did not personally see and hear the witnesses, we ourselves are convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 325 (C.M.A. 1987).

To convict appellant of sexual abuse of a child in violation of Article 120b, UCMJ, as charged, the government was required to prove beyond a reasonable doubt that it was appellant who committed a lewd act upon the victim, a child under 16 years of age, by intentionally communicating the charged indecent language to her—"helicopter sit and spin midget" and "you're such a tease"—and that he did so with an intent to arouse his sexual desire.

Article 120b, UCMJ, defines "lewd act" in relevant part, as "intentionally communicating indecent language to a child by any means, including via any communication technology, with an intent to . . . arouse or gratify the sexual desire of any person," 10 U.S.C. § 920b(h)(5)(C); and "any indecent conduct, intentionally done with or in the presence of a child, including via any communication technology," amounting to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations, 10 U.S.C. § 920b(h)(5)(D). Our superior court "has long held that indecent is synonymous with obscene." *United States v. Meakin*, 78 M.J. 396, 401 (C.A.A.F. 2019) (citation omitted). Whether a word, sound, or other communication is indecent "must be evaluated in the context in which it was made." *United States v. Green*, 68 M.J. 266, 270 (C.A.A.F. 2010) (affirming the CCA's decision that "mmmm-mmmm-mmmm" constituted "indecent" language within the context of the utterance).

## 2. *Discussion*

Like the factfinder at trial, who saw and heard the evidence, this court is also convinced beyond a reasonable doubt of appellant's guilt and finds the evidence factually sufficient. Like the factfinder at trial, we are unconvinced that appellant's son was the one who sent the victim messages from appellant's social media accounts on 29 June 2020. Based on the evidence presented at

---

[8] Congress subsequently amended Article 66, UCMJ, to modify the statutory standard for factual sufficiency review, which applied to offenses that occurred on or after the date of enactment. Fiscal Year 2021 National Defense Authorization Act (NDAA), P.L. 116-283, 1 January 2021.

trial, we find this theory implausible for many of the same reasons the government argued to the panel members.

The style and punctuation of the messages sent to the victim from appellant's account matched the typical style and punctuation of appellant's text messages and not his son's. The first words of sentences and pronouns like "I" were almost always capitalized and sentences sometimes, although not always, ended with punctuation in messages sent to the victim: "How's life in Washington going?" and "Staying out of trouble?". In contrast, neither the 13-year-old victim nor appellant's 14-year-old son used capitalization or punctuation in their day-to-day messaging. When asked why she did not capitalize the start of her sentences, the victim testified, "Because it's kind of cool if you don't with people my age."

The panel heard evidence about the default text settings for cell phones. Appellant's son testified that his cell phone's default was set to not capitalize words and, thus, he had to manually edit the messages to the victim as he typed so as to match the style of his father's texts. To support this, the defense identified numerous times that the messages from appellant's account failed to begin a sentence with a capitalized sentence, arguing these slip-ups were the consequence of appellant's son failing to perfectly imitate his father. We note, however, of the over 190 messages sent to the victim from the exchange initiated on 29 June 2020—excluding messages with only emojis—only 22 messages did not begin with capitalization. Of those 22 messages, all but two began with "lol" or "lmao."[9] The word "lol" was also not capitalized in messages appellant sent to the victim in February 2020. Yet, appellant's son testified that the first "lol" message was not sent by him: "That wasn't me." Therefore, appellant sent the messages to the victim in February 2020, which would indicate appellant's settings also do not capitalize "lol" by default or otherwise. If we were to believe the defense theory, that would indicate appellant's 14-year-old son manually capitalized the beginning of approximately 170 messages to the victim.

The topics of the messages to the victim were those familiar and second nature to appellant, not to his son. There were repeated references to the height discrepancy between appellant and the victim, whereas appellant's son was only a few inches taller than the victim at 5 feet, 3 inches.[10] There were repeated

---

[9] Of these, most begin with "lol," whereas "lmao" was used approximately six times.

[10] Appellant's wife testified that the Instagram messages stating appellant was 6 feet tall got her husband's height wrong, which is how she knew it was her son sending

(continued . . .)

references to the age difference between appellant and the victim—"Well I'm old, I should stop texting you," "your ears are too young"—whereas appellant's son was not that much older than the 13-year-old victim. And there were references to appellant's back injuries.

The messages from appellant's Instagram account also do not read like the messages of a teenager, but read like the messages of a 39-year-old man—"I work all the time,"—who is writing to a 13-year-old girl and, for that reason, would need to keep the conversation discreet. The messages told the victim that if they were to meet up it would have to be on the "DL," in other words, kept quiet. When the victim stated some of her boyfriends have been "older," appellant assumed she meant "in their 20s or something," when in actuality the victim was referring to 15-year-old boys because 15 is older to a 13-year-old—but would not seem old to an adult. And when they discussed the victim's boyfriends and whether she had "messed around" with some of them, the appellant responded: "I don't know how to react now . . . I'm scared to talk to you now." This is a natural response for a 39-year-old married man messaging a 13-year-old victim, not for a 14-year-old boy messaging a slightly younger teenage girl he thinks is cute.

When the victim's mother asked appellant's son multiple different ways during the video chat about whether he had ever messaged the victim on Snapchat, he denied it. Appellant's son testified that he did not tell the victim's stepmother about the Snapchat messages initially because he did not want to get in more trouble. But it is more plausible that he denied sending messages on Snapchat because he did not know about the messages exchanged on Snapchat. Appellant told the victim in their messages, "no one really knows I have it," referring to his Snapchat account. Given he did not receive any notifications of screenshots, there was no reason for appellant to believe there would be screenshots of his messages to the victim. There was no reason for appellant's son to deny sending the messages on Snapchat when he had already confessed to sending the other messages. There was no reason to deny it unless he did not know about the Snapchat messages because he did not send them. But there were many reasons for appellant's son to say it was him, including that he loved his father, trusted his father, and did not want to see him get in trouble.

Even his guilty reaction when initially confronted by the vicitm's father, his close friend of eight years corroborated it was appellant who sent the

_____

(. . . continued)
the messages to the victim—because appellant was 5 feet, 11 inches tall. But the panel also heard testimony from other witnesses that appellant was "around 6-foot".

messages. Appellant would not look his friend in the eye. Further, appellant told CID that he only messaged the victim, "How's life." Yet, the only time "How's life" appears in the messages introduced at trial between appellant and the victim is the beginning of the conversation on 29 June 2020: "How's life in Washington going?" The messages called the victim "Savage," mirroring the words on the Christmas gift to the victim. While there was no direct evidence that appellant sent the messages, the government introduced an overwhelming amount of circumstantial evidence that it was appellant and not his son who messaged the victim on 29 June 2020. "It is well accepted that circumstantial evidence is sufficient to sustain a finding of guilt." *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004); *see also* R.C.M. 918(c) ("Findings may be based on direct or circumstantial evidence.")

We also conclude, contrary to appellant's argument, that in light of the context of the entire message exchange between appellant and the victim, the charged language was both indecent and made with the intent to arouse appellant's sexual desires. First, we find the words indecent within the context of the messages to the 13-year-old victim. One communication made reference to a sexual position—"helicopter sit and spin midget" [11]—the other called the victim "a tease" after informing her she should make an OnlyFans page with "normal pictures," when users typically sell explicit content of themselves. The messages were made in the context of discussions about how intimate the victim had been with her boyfriends. Appellant called the victim "helicopter sit and spin midget" after the victim indicated she knew what the term "sit and spin" meant. In short, communicating sexual positions to a child under the age of 16 and calling the victim "a tease" against the backdrop of the sexual topics discussed reflect both the indecent nature of the language and the intent with which it was communicated.

---

[11] In his third assignment of error, appellant alleges that the military judge erred by allowing three witnesses—the victim's father, the victim's stepmother, and a CID agent—to testify to the meaning of "helicopter sit and spin" as lay opinions under M.R.E. 701. Rule 701 requires, in relevant part, that a lay opinion be rationally based on the witness's perception and helpful to the determination of a fact in issue. We do not find an abuse of discretion in this case where the witnesses testified that they had personal knowledge of the term or, in the case of the CID agent, often reviewed and interpreted slang terms such as "sit and spin," and the language or slang was not facially coherent. *Compare United States v. Byrd*, 60 M.J. 4 (C.A.A.F. 2004) (finding error where there was a lack of foundation for witness's interpretation of facially coherent language). Contrary to appellant's argument, the testimony left the ultimate issue of whether the language was indecent to the factfinder.

For all these reasons, we find appellant's conviction to the Article 120b, UCMJ offense factually sufficient and consequently, we find appellant's convictions for the other offenses of false official statement and wrongful interference with an adverse administrative proceeding also factually sufficient.

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Senior Judge Morris and Judge Juetten concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court